1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MICHELE J. SWANSON, State Bar No. 191193
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5703
     Fax:  (415) 703-1234
8    Email:  Michele.Swanson@doj.ca.gov
   Attorneys for Respondent

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13  **CHRISTOPHER A. CARRASCO,**                  C 07-5666 MMC (PR)

14                                    Petitioner,

15              **v.**

16  **ROBERT A. HOREL, Warden,**

17                                    Respondent.

18

19  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO
    PETITION FOR WRIT OF HABEAS CORPUS**

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3  STATEMENT OF THE CASE ................................................ 1

4  STATEMENT OF FACTS .................................................... 2

5  STANDARD OF REVIEW .................................................. 4

6  ARGUMENT ..................................................................... 5

7  I.  THE PROSECUTOR DID NOT COMMIT MISCONDUCT .......... 5

8      A.  The Prosecutor Did Not Present False And Misleading Testimony In
           The Form Of Sergeant Miranda's Testimony Regarding The Norteno
9          Gang .................................................................. 6

10     B.  The Prosecutor Did Not Present False And Misleading Evidence In The
           Form Of Pascali's Testimony Identifying The Defendants As The
11         Assailants, Or Regarding Pascali's Motivation For Testifying ...... 8

12     C.  The Prosecutor Did Not Commit Misconduct During His Closing
           Argument By Relying On Evidence Presented At Trial That The Attack
13         On Langenegger Was Gang Motivated And That Langenegger And
           Pascali Were Afraid To Testify Against Gang Members ............ 10

14
       D.  The Prosecutor Did Not Suppress Evidence That Pascali Acted As An
15         Informant In The Past ................................................ 12

16     E.  The Prosecutor's Evidence That Pascali Did Not Testify In Exchange
           For Favorable Treatment At His Parole Revocation Hearing And That
17         He Absconded From Parole Because He Feared Retaliation By The
           Nortenos Was Not False And Misleading ............................ 13

18
           1.  Trial Testimony .............................................. 13
19
           2.  The Trial Testimony Was Not False And Misleading ...... 16
20
       F.  The Prosecutor Did Not Introduce Involuntary Statements Or
21         Improperly Collected Evidence ...................................... 17

22         1.  Alleged Involuntary Statements .............................. 17

23         2.  Alleged Improper Collection Of Evidence .................. 20

24  II.  TRIAL COUNSEL WAS NOT INEFFECTIVE ...................... 21

25  III. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY
          ON AIDING AND ABETTING ...................................... 24
26
       A.  Instructions On Aiding And Abetting .............................. 24
27
       B.  California Court Of Appeal Opinion ................................ 25

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

i

**TABLE OF CONTENTS  (continued)**

|  |  | Page |
|---|---|---|
| C. | The Aiding And Abetting Instructions Did Not Violate Due Process | 25 |
| **IV.** | **PETITIONER'S CLAIM OF STATE LAW SENTENCING ERROR IS NOT COGNIZABLE ON FEDERAL HABEAS; EVEN IF COGNIZABLE, THE CLAIM LACKS MERIT** | 26 |
| A. | Sentencing Hearing | 26 |
| B. | California Court Of Appeal Opinion | 26 |
| C. | The Claim Is Not Cognizable; In The Alternative, It Lacks Merit | 27 |
| CONCLUSION | | 29 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arizona v. Fulminante*
499 U.S. 279 (1991)                                    20

*Blackburn v. Alabama*
361 U.S. 199 (1960)                                    17

*Brady v. Maryland*
373 U.S. 83 (1963)                                     12

*Brecht v. Abrahamson*
507 U.S. 619 (1993)                                 10, 20

*Christian v. Rhode*
41 F.3d 461 (9th Cir. 1994)                            27

*Coe v. Bell*
161 F.3d 320 (6th Cir.1998)                             8

*Colorado v. Connelly*
479 U.S. 157 (1985)                                    17

*Cupp v. Naughten*
414 U.S. 141 (1973)                                    25

*Darden v. Wainwright*
477 U.S. 168 (1986)                                    10

*Doe v. Woodford*
508 F.3d 563 (9th Cir. 2007)                            5

*Douglas v. Woodford*
316 F.3d 1079 (9th Cir. 2003)                          19

*Drayden v. White*
232 F.3d 704 (9th Cir. 2000)                           11

*Duckett v. Mullin*
306 F.3d 982 (10th Cir. 2002)                          11

*Edwards v. Lamarque*
475 F.3d 1121 (9th Cir. 2007)                           5

*Estelle v. McGuire*
502 U.S. 62 (1991)                                  25-27

*Fry v. Pliler*
127 S.Ct. 2321 (2007)                                   7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES** (continued)

**Page**

*Grisby v. Blodgett*
130 F.3d 365 (9th Cir. 1997)                                    23

*Harris v. Vasquez*
949 F.2d 1497 (9th Cir. 1990)                                   23

*Hayes v. Brown*
399 F.3d 972 (9th Cir. 2005)                                    6

*Henderson v. Campbell*
2007 WL 781966 (N.D. Cal. 2007)                                 8

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005)                                   22

*Kimmelman v. Morrison*
477 U.S. 365 (1986)                                            22

*Kyles v. Whitley*
514 U.S. 419 (1995)                                            20

*Le v. Mullin*
311 F.3d 1002 (10th Cir. 2002)                                 11

*Lewis v. Alexander*
11 F.3d 1349 (6th Cir. 1993)                                   22

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                             5

*Medeiros v. Shimoda*
889 F.2d 819 (9th Cir. 1989)                                   18

*Middleton v. Cupp*
768 F.2d 1083 (9th Cir. 1985)                                  27

*Miller v. Anderson*
255 F.3d 455 (7th Cir. 2001)                                   23

*Miller v. Fenton*
474 U.S. 104 (1985)                                            17

*Miller v. Vasquez*
868 F.2d 1116 (9th Cir. 1989)                                  27

*Miller-El v. Dretke*
545 U.S. 231 (2005)                                            5

*Miranda v. Arizona*
384 U.S. 436 (1966)                                          17-19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus        Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

iv

TABLE OF AUTHORITIES  (continued)

Page

*Napue v. Illinois*
360 U.S. 264 (1959) — 6

*North Carolina v. Butler*
441 U.S. 369 (1979) — 19

*People v. Modiri*
39 Cal.4th 481 (2006) — 2

*Pope v. Zenon*
69 F.3d 1018 (9th Cir. 1995) — 20

*Richmond v. Lewis*
506 U.S. 40 (1992) — 27

*Rupe v. Wood*
93 F.3d 1434 (9th Cir.1996) — 22

*Sandoval v. Calderon*
241 F.3d 765 (9th Cir. 2000) — 10

*Schneckloth v. Bustamonte*
412 U.S. 218 (1973) — 17

*Shackleford v. Hubbard*
234 F.3d 1072 (9th Cir. 2000) — 5, 19

*Shumate v. Newland*
75 F.Supp.2d 1076 (N.D. Cal. 1999) — 23

*Smith v. Angelone*
111 F.3d 1126 (4th Cir. 1997) — 22

*Souch v. Schaivo*
289 F.3d 616 (9th Cir. 2002) — 27

*Strickland v. Washington*
466 U.S. 668 (1984) — 21, 22

*Strickler v. Greene*
527 U.S. 263 (1999) — 12

*Sublett v. Dormire*
217 F.3d 598 (8th Cir. 2000) — 11

*United States v. Leon Guerrero*
847 F.2d 1363 (9th Cir. 1988) — 18

*United States v. Schaflander*
743 F.2d 714 (9th Cir. 1984) — 22, 23

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus       Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

v

**TABLE OF AUTHORITIES  (continued)**

Page

*United States v. Sherlock*
962 F.2d 1349 (9th Cir. 1992)                                                    8

*United States v. Zuno-Arce*
44 F.3d 1420 (9th Cir. 1995)                                                     8

*Williams v. Woodford*
384 F.3d 567 (9th Cir. 2004)                                                    19

*Wilson v. Henry*
185 F.3d 986 (9th Cir.1999)                                                     22

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                            4, 5

*Yarborough v. Gentry*
540 U.S. 1 (2003)                                                              21

*Ylst v. Nunnemaker*
501 U.S. 797 (1991)                                                         5, 19

**Constitutional Provisions**

United States Constitution
        Fourteenth Amendment                                                   17

**Statutes**

United States Code, Title 28
        § 2254(a)                                                              27
        § 2254(d)(1)                                                            5

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996                         4, 5

CALJIC
        No. 3.01                                                               24
        No. 3.02                                                               24
        No. 9.00                                                               26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MICHELE J. SWANSON, State Bar No. 191193
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5703
    Fax: (415) 703-1234
8   Email: Michele.Swanson@doj.ca.gov
   Attorneys for Respondent
9
                 IN THE UNITED STATES DISTRICT COURT
10
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                       SAN FRANCISCO DIVISION
12

13  **CHRISTOPHER A. CARRASCO,**            C 07-5666 MMC (PR)

14                          Petitioner,     **MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN**
15       **v.**                             **SUPPORT OF ANSWER TO
                                            PETITION FOR WRIT OF**
16  **ROBERT A. HOREL, Warden,**            **HABEAS CORPUS**

17                          Respondent.

18

19

20                     **STATEMENT OF THE CASE**

21       In 2001, a jury found petitioner guilty of assault by means of force likely to produce great

22  bodily injury, battery with serious bodily injury, and the use of methamphetamine.[1] 2 CT 472-482.[2]

23

24  _____

       1. Petitioner was convicted along with four co-defendants: Steven Pena, Andres Perez, Jerry
25  Patlan, and Gustavo Castaneda. *See* 2 CT 472-482.

26     2. "CT" refers to the State Court Clerk's Transcript, which is contained in Exhibits 1A to 1C
   filed in support of the Answer. "RT" refers to the State Court Reporter's Transcript, which is
27  contained in Exhibits 2A to 2F filed in support of the Answer. The number preceding "CT" or "RT"
   refers to the volume number, and the number following refers to the page number.
28

1   The jury also found true the allegation that the assault and battery were committed for the benefit of

2   a criminal street gang. 2 CT 472-482. Petitioner admitted that he had three prior strike convictions,

3   one prior serious felony conviction, and three prior prison terms. 2 CT 469, 489. The trial court

4   sentenced petitioner to 33 years to life in state prison. 3 CT 770-774.

5         In 2005, the California Court of Appeal reversed petitioner's gang enhancement, but

6   otherwise affirmed the judgment. Exh. 3. The California Supreme Court denied petitioner's petition

7   for review, but granted the State's petition for review. Exhs. 4-6. The court deferred further action

8   in the matter pending resolution of a related issue in *People v. Modiri*, S120238. Exh. 6. The court

9   denied petitioner's petition for writ of habeas corpus. Exhs. 7-8.

10         In 2007, the California Supreme Court transferred the case back to the California Court

11   of Appeal for reconsideration of its earlier opinion in light of the Supreme Court's holding in *People*

12   *v. Modiri*, 39 Cal.4th 481 (2006). Exh. 9. The Court of Appeal vacated a portion of its previous

13   opinion as to one of petitioner's co-defendants, but left intact its ruling as to petitioner's judgment.

14   Exh. 10. Petitioner did not seek review of the court's opinion on remand.

15         On November 7, 2007, petitioner filed the instant petition. On April 11, 2008, the Court

16   ordered respondent to show cause why the petition should not be granted.

17

18   **STATEMENT OF FACTS**

19   The facts were summarized by the California Court of Appeal as follows:

20         On October 27, 2000, Charlie Langenegger was serving time in Santa

21   Clara County Jail, and housed in a 16-man cell, with four of the named
     defendants (Gustavo Castenada, Jerry Patlan, Steven Pena and Andres Perez)
     and others. Defendant Christopher Carrasco was housed in a four-person cell

22   across the walkway. Langenegger worked as a barber in the jail and as such, was
     given certain privileges, including being allowed to go to different parts of the

23   facility.

24         That night, Langenegger was asleep on his bunk, when he was awakened
     by someone calling his name. He went to the front gate of the cell and was hit

25   multiple times from behind. According to his testimony at trial, he did not see
     who hit him, but he could tell that there was more than one person involved.

26   Langenegger was hit and kicked numerous times, and eventually yelled to the
     guard, "Man down."

27

28         Correctional Officer Lee testified that he responded to the call and found

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus      Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

2

Langenegger holding on to the cell gate and looking dazed. He reported that Langenegger said: " 'Chris called me to the gate. I got out of bed, and Norteños jumped me.' " Officer Lee took Langenegger to another location, and then investigated the incident. In the cell, he noticed defendant Patlan breathing rapidly.

At trial, Osvaldo Pascali, a cellmate who witnessed the attack, testified. He said that Carrasco called Langenegger to the gate, and Perez hit him in the head from behind. Pascali said that Pena, Patlan and Castenada joined the attack and kicked and punched Langenegger, as he fell to his knees and then to the ground. Pascali reported the same details to Officer Lee. Pascali also said he was afraid for his safety as a result of his testimony. He testified that he was currently in protective custody within the jail, but still did not feel adequately protected. He said that a person who is labeled a "snitch" is often killed.

Sergeant Marc Tarabini, a jail supervisor, called Langenegger after he was sent to the emergency room. When Sergeant Tarabini asked who had attacked him, Langenegger refused to give names, saying he was afraid of the Norteños. Langenegger told Tarabini that the Norteños "run the tier and run the whole place." He said that he was being pressured by Norteños to run "kites" (messages passed by inmates) to the maximum security area and that he had refused.

When Langenegger returned from the hospital, Officer Lee contacted him and gave him the names of the defendants, and asked if they were the ones who attacked him. According to Officer Lee, Langenegger nodded his head and thanked him.

At trial, Langenegger denied making any of the statements about the attack as reported by Tarabini or Lee. He testified that his only statements were that he did not know who attacked him. He also admitted to a code of silence in prison, and said that an inmate testifying against another inmate would be stabbed. He said that protective custody does not provide protection from this type of retaliation. Langenegger also testified as to his injuries: his jaw was broken, it was wired shut for four months, and required several surgeries. He also suffered extensive bruising and a chipped hip bone.

Also at trial, Sergeant Tarabini testified about an interview he had with defendant Carrasco on the night of the incident. According to Tarabini, Carrasco admitted that he had called Langenegger to the gate because Langenegger had "[d]isrespected a Norteño gang member" and "had to be checked." Sergeant Tarabini also noticed that Carrasco appeared to be under the influence of a stimulant, and Carrasco admitted using methamphetamine that night.

Various law enforcement officers testified at trial concerning the evidence of gang membership accumulated on each of the defendants.

Sergeant David Miranda qualified as a gang expert with the Department of Corrections, and explained that "The Machine" is a regimented exercise program performed by Norteño gang members while in custody. Sergeant Miranda testified in detail about the origins of the Norteño gang especially in prison. He explained membership requirements, as well as specific tattoos and the color red as common symbols. He further opined that, based on the facts of the case, he believed that the assault on Langenegger was carried out with the

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

3

specific intent to promote and further Norteño gang activity. He also found significant defendant Carrasco's statement to Sergeant Tarabini, that Langenegger had "disrespected a Norteño gang member" and "had to be checked." This statement showed the attack was gang-related, according to Miranda.

Several defendants presented witnesses at trial. Defendant Perez testified himself and stated that he was not a Norteño gang member and did not know the defendants when he was first placed in cell 336. He also testified that he called Langenegger to the bars, and as Langenegger approached, Perez punched him in the mouth. As Langenegger staggered, Perez continued to punch him, and he denied that anyone else was involved in the assault. Perez explained that about 20 minutes before the assault, he learned that Langenegger had previously been convicted of rape. Perez's younger sister had been raped and he was upset that the rapist was released after only a year in custody. Perez's mother Alice testified, and confirmed the details surrounding the sister's rape. She also testified that she had never known Perez to be involved in a gang, and that before he was incarcerated, he was working 12 to 14 hours a day. Correctional Officer Dennis Cortez also testified that he was a long-time friend of Perez's and had never known him to be involved in a gang.

Defendant Patlan called Parole Agent Michelle Donovan as a witness to give details about Osvaldo Pascali's parole hearing on November 8, 2000. Agent Donovan testified that Pascali was returned to custody on a parole violation on October 10, 2000, and at his hearing on November 8, he received credit for time served and was released. She admitted that she had mentioned to the parole hearing officer that Pascali had cooperated in the investigation of five other inmates, but she did not believe that fact had any bearing on the result of the parole hearing.

Defendant Pena presented evidence that there were 16 people housed in cell 336 on the night of the incident, and that seven of them were believed to be gang members.

Defendants were all charged with assault by means of force likely to produce great bodily injury (Pen.Code, § 245, subd. (a)(1); count 1), and battery with serious bodily injury (§§ 242, 243, subd. (d); count 2). The information also alleged personal infliction of great bodily injury and offenses committed for the benefit of a criminal street gang. (§§ 12022.7, 186.22, subd. (b)(1).) (Prior convictions and strikes were also individually alleged.) A jury found the defendants guilty as charged.

Exh. 3 at 2-5, footnotes omitted.


## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

1   U.S. 19, 24 (2002) (per curiam). Under AEDPA, the federal court has no authority to grant habeas

2   relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

3   clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A decision constitutes an

4   unreasonable application of Supreme Court law only if the state court's application of law to the facts

5   is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75

6   (2003). Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should

7   the court grant relief. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting

8   *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005)). The petitioner bears the burden of showing that the

9   state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

10          When there is no reasoned opinion from the highest state court on the petitioner's claim,

11   the court looks to the last reasoned state court opinion in deciding the petition. *See Ylst v.*

12   *Nunnemaker*, 501 U.S. 797, 801-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th

13   Cir. 2000). When there is no reasoned opinion, the state court's decision is still reviewed under

14   AEDPA's objectively reasonable standard on federal habeas. While federal habeas review is not de

15   novo in such a case, an independent review of the record is necessary to determine whether the state

16   court's decision was objectively unreasonable. *Doe v. Woodford*, 508 F.3d 563, 567 (9th Cir. 2007).

17

18                                      **ARGUMENT**

19                                          **I.**

20                   **THE PROSECUTOR DID NOT COMMIT MISCONDUCT**

21          Petitioner raises several claims of prosecutorial misconduct. We note that petitioner raised

22   his claims for the first time on state habeas. *See* Exh. 7. Accordingly, there is no reasoned state

23   court decision addressing his claims. We consider each alleged instance of prosecutorial misconduct

24   in turn below.

25   ///

26   ///

27   ///

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus    Carrasco v. Horel, Warden
                                                                                                C 07-5666 MMC (PR)

5

A.    **The Prosecutor Did Not Present False And Misleading Testimony In The Form Of Sergeant Miranda's Testimony Regarding The Norteno Gang**

Petitioner contends that Sergeant Miranda's testimony that the Norteno gang is a "monolithic northern California Hispanic prison gang" was "false and misleading" because "there is no single 'Norteno' prison gang operating in California." Petition at 6G; *see also* Exh. 7 at 8. Petitioner asserts that the term "Norteno" is a custodial designation for Hispanic inmates from northern California rather than a gang identification. Petition at 6G; *see also* Exh. 7 at 8-9. Petitioner cites generally to Officer Lee's preliminary hearing testimony as evidence that Sergeant Miranda's testimony was false and misleading. Petition at 6G-6H; *see also* Exh. 7 at 9. However, a review of both officers' testimony reveals that they were in accord on the existence and structure of the Norteno gang.

A prosecutor violates due process by obtaining a conviction through false or misleading evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To succeed on a claim under *Napue*, a petitioner must show: "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc).

Officer Lee testified at the preliminary hearing that he was working as a correctional officer at the Santa Clara County jail on the night of the assault. 1 CT 74-75. He also qualified as an expert witness on the subject of prison gangs inside the Santa Clara County jail. 1 CT 80. He described the Norteno gang as an organized Hispanic gang from northern California that operates both inside and outside the Santa Clara County jail. 1 CT 81. The gang is made up of members from different "sets," or neighborhoods. 1 CT 103, 108. Inside prison, Nortenos affiliate with the Nuestra Familia prison gang. 1 CT 103.

Sergeant Miranda testified that he was a correctional officer at San Quentin State Prison. 5 RT 621-622. He qualified as an expert witness on the subject of gangs. 5 RT 624, 632. He testified that before 1998, Norteno was simply a geographic term used by state prison inmates to identify which part of California they were from. 5 RT 627, 632. After 1998, however, the term

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

6

1   Norteno came to be applied to a northern California Hispanic gang that arose out of the Nuestra

2   Familia and Northern Structure prison gangs. 5 RT 632-636. State prison authorities recognize the

3   difference between a Hispanic inmate who simply hails from northern California and a member of

4   the Norteno gang. 5 RT 719. The Norteno gang is made up of members from different "regiments,"

5   which are organized by area or city. 5 RT 665. Inside prison, the Norteno gang encompasses both

6   the Northen Structure and Nuestra Familia prison gangs. 5 RT 632-635, 646. The Norteno gang is

7   run by the leaders of Nuestra Familia. 5 RT 664.

8           Both officers, then, testified that the Norteno gang is an "organization" of several northern

9   California Hispanic gangs, and not simply a geographic term to describe which region of the state

10  an inmate hails from. There is thus no support for petitioner's argument that Sergeant Miranda's

11  testimony was actually false or that the prosecutor knew or should have known of its falsity based

12  on Officer Lee's testimony.

13          Petitioner also contends that the prosecution's presentation of "tattoos as evidence of gang

14  membership" was false and misleading because "tattoos alone cannot be used" by state prison

15  authorities to validate an inmate as a member of a gang. Petition at 6H; *see also* Exh. 7 at 9.

16  However, just because state prison authorities must rely on at least three pieces of evidence to

17  validate an inmate as a gang member in order to house him in the Security Housing Unit does not

18  mean that Sergeant Miranda was foreclosed from basing his opinion of gang membership in this case

19  on tattoos and evidence surrounding the assault. Again, there is no support for petitioner's argument

20  that Sergeant Miranda's testimony was actually false or that the prosecutor knew or should have

21  known of its falsity based on state prison policy. Moreover, given Sergeant Miranda's testimony that

22  petitioner's tattoos could not be used to show gang affiliation, *see* 5 RT 673, petitioner cannot show

23  that the tattoo evidence was material to his case.

24          In any event, petitioner could have suffered no prejudice as a result of such testimony

25  because the judgment on his gang enhancement was reversed by the California Court of Appeal on

26  direct appeal. Federal habeas relief is therefore unwarranted on this claim. *Fry v. Pliler*, 127 S.Ct.

27  2321, 2328 (2007) (constitutional error must have a substantial or injurious effect on the verdict).

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

7

**B.    The Prosecutor Did Not Present False And Misleading Evidence In The Form Of Pascali's Testimony Identifying The Defendants As The Assailants, Or Regarding Pascali's Motivation For Testifying**

Petitioner next asserts that Pascali's testimony identifying the defendants as the assailants in this case was false and misleading. Petitioner asserts that at trial, Pascali falsely identified Patlan rather than Perez as the first person to assault Langenegger, in contrast to his statement to Officer Lee immediately after the attack, in which he identified Perez as the initial assailant. Petition at 6I; *see also* Exh. 7 at 10. Petitioner also asserts that Pascali falsely identified Castenada as one of the assailants, contrary to the posttrial declaration of Roman Rodriguez Lara stating that Castenada was not involved in the attack. Petition at 6I; *see also* Exh. 7 at 10-11.

However, while Pascali initially identified Patlan at trial as the first attacker, he changed his testimony after remembering that Perez was actually the first person to attack Langenegger. 3 RT 271-272. Pascali's testimony was therefore consistent with his statement to Officer Lee, *see* 4 RT 419-421, and there is no support for petitioner's suggestion that he testified falsely on this point. "'[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.'" *Henderson v. Campbell*, 2007 WL 781966 at *20 (N.D. Cal. 2007) (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998)); *see also United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct where discrepancies in testimony could as easily flow from errors in recollection as from lies).

Nor can petitioner demonstrate that Pascali falsely identified Castenada as one of the assailants simply by pointing out that Castenada's bunkmate, in a posttrial declaration filed in support of Castenada's state habeas petition, claimed that Castenada did not participate in the attack. *See, e.g., United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1992) (finding that inconsistencies between the testimony of witnesses does not establish the presentation of false evidence). Even if such conflicting statement by Castenada's bunkmate were sufficient to show the falsity of Pascali's testimony, such statement was not available to the prosecutor at trial, which defeats any claim that the prosecutor knew or should have known of the falsity of Pascali's testimony. On the contrary, because Pascali's identification of Castenada was consistent with his statement to Officer Lee

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus

Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

8

1   immediately after the attack, *see* 4 RT 419-421, the prosecutor had every reason to believe the truth

2   of such testimony.  In sum, no prosecutorial misconduct in the presentation of false evidence is

3   shown.

4          Petitioner additionally contends that the prosecutor presented false and misleading

5   evidence that Pascali expected no benefit when he spoke to authorities after the assault.  Petition at

6   6I-6J; *see also* Exh. 7 at 11.  Petitioner asserts that while Pascali and Officer Lee both testified that

7   Pascali neither asked for nor was promised any benefit in exchange for talking to jail authorities

8   about the assault, Officer Lee's reference to Pascali in his report as an "informant" proves that

9   Pascali did indeed expect some benefit in talking to authorities.  Petition at 6I-6J; *see also* Exh. 7

10  at 11.  In addition, petitioner asserts that General Order #21.00 of the Santa Clara County Sheriff's

11  Office defines a confidential informant as an individual who is "'willing to provide information to

12  law enforcement *based on considerations other than good citizenship.*'"  Petition at 6J, emphasis

13  added by petitioner; *see also* Exh. 7 at 11.  Petitioner contends that had jurors known that Pascali

14  expected some benefit when he talked to authorities, they would have discounted his identifications

15  of the defendants as Langenegger's assailants.  Petition at 6J; *see also* Exh. 7 at 12.

16         What petitioner neglects to mention is that the reason why Officer Lee referred to Pascali

17  as an "informant" in his report was for Pascali's own protection, not because Pascali asked for or was

18  promised anything in return for talking to authorities.  4 RT 421; *see also* 3 RT 372-373.  Moreover,

19  petitioner's reference to the definition of a confidential informant in General Order #21.00 proves

20  nothing, given Officer Lee's testimony that he used the word "informant" in a manner different from

21  the General Order.  *See* 4 RT 421.  In sum, there is no evidence to support petitioner's contention

22  that Pascali expected or was offered some benefit in talking to authorities, or that the prosecution

23  knew or should have known about such evidence.  On the contrary, Pascali's and Officer Lee's

24  testimony establish that no such benefits were contemplated or discussed when Pascali spoke to

25  authorities after the attack.  *See* 3 RT 286, 303-305, 321-322, 327-329, 372-373; 4 RT 421, 430-432,

26  435, 450.  Accordingly, the record does not support petitioner's claim of prosecutorial misconduct.

27  ///

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                           C 07-5666 MMC (PR)

9

**C.    The Prosecutor Did Not Commit Misconduct During His Closing Argument By Relying On Evidence Presented At Trial That The Attack On Langenegger Was Gang Motivated And That Langenegger And Pascali Were Afraid To Testify Against Gang Members**

Petitioner next claims that the prosecutor committed misconduct during his closing argument by using the Norteno gang evidence to inflame the passions of the jury. Petition at 6J; *see also* Exh. 7 at 12. The record of the prosecutor's argument, however, undermines petitioner's claim.

To prevail on a claim of prosecutorial misconduct based on improper closing argument, a petitioner must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of Due Process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). Moreover, constitutional error from prosecutorial misconduct does not warrant habeas relief unless the prosecutor's argument had "[a] substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v. Calderon,* 241 F.3d 765, 778 (9th Cir. 2000) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993)).

Petitioner contends that the prosecutor's references to the strength and dangerousness of the Norteno gang in the introductory remarks of his closing argument were meant only to inflame the passions of the jury. Petition at 6J-6K; *see also* Exh. 7 at 12. However, when read in context, it becomes apparent that the prosecutor's comments about the gang were not meant to be inflammatory. Rather, the prosecutor was advancing his theory that the attack on Langenegger was gang related, and explaining why Langenegger, Pascali, and other inmates were afraid to testify against the defendants. *See* 6 RT 831-832. For instance, in arguing that the attack on Langenegger was gang motivated, the prosecutor pointed out that "[i]f you rebel and don't go along with the program, things happen to you. That is what happened to Charlie, okay." 6 RT 831. In addition, to explain why Pascali was the only witness to come forward to identify the defendants, the prosecutor noted that other witnesses "don't want to be injured, they don't want to die, they don't want to be attacked by other inmates and the gang members." 6 RT 831.

Petitioner also contends that the prosecutor committed misconduct by arguing "that the jury must convict in order to protect not only the jail, but the entire criminal justice system against

1 | 'the gang.'" Petition at 6K; *see also* Exh. 7 at 13. However, when read in context, it is apparent that

2 | the prosecutor was not urging the jury to ignore the evidence and convict the defendants in order to

3 | protect society. Rather, the prosecutor was again explaining why Langenegger and Pascali were

4 | afraid to testify against the defendants, and exhorting jurors not to let the gang's intimidation of

5 | those witnesses prevent them from returning a guilty verdict. *See* 6 RT 832-833. Even if the

6 | prosecutor's remarks could be interpreted in the manner suggested by petitioner, they would still not

7 | rise to the level of prosecutorial misconduct. *See Duckett v. Mullin*, 306 F.3d 982, 990 (10th Cir.

8 | 2002) (appeal to societal harm does not violate due process); *Sublett v. Dormire*, 217 F.3d 598, 601

9 | (8th Cir. 2000) (urging jury to send a message with its sentence did not affect fairness of trial).

10 |     In sum, the prosecutor's argument was a fair comment on the evidence, and did not so

11 | infect the trial with unfairness as to make the resulting conviction a violation of due process. Even

12 | if the prosecutor's remarks rose to the level of prosecutorial misconduct, petitioner cannot show that

13 | they had a substantial and injurious effect on the jury's verdict. The comments petitioner complains

14 | about occurred within the first few pages of the prosecutor's lengthy closing argument, *see* 6 RT

15 | 831-859, and were followed by equally lengthy defense closing arguments and the prosecutor's

16 | rebuttal argument. *See* 6 RT 859-951. It is thus unlikely that the comments had a lasting impression

17 | in the minds of the jurors. Moreover, we note that none of the defense counsel objected to the

18 | prosecutor's remarks, which suggests that counsel did not perceive the remarks as improper or

19 | prejudicial. *See Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (noting that counsel's failure

20 | to object is relevant to the fundamental fairness assessment). Further, the jury was instructed that

21 | the arguments of the attorneys were not evidence. *See* 6 RT 956; *see also Drayden v. White*, 232

22 | F.3d 704, 713 (9th Cir. 2000) (relying in part on court's instruction to jury that statements made by

23 | attorneys during trial are not evidence to support finding that prosecutor's comments did not violate

24 | due process). Finally, given Langenegger's and Pascali's identification of petitioner as the instigator

25 | of the assault, *see* 3 RT 265, 273; 4 RT 412, 416, 421, as well as petitioner's own admission that he

26 | was the one to call Langenegger to the front of his cell, *see* 4 RT 546, the prosecutor's remarks could

27 | not have had a substantial and injurious effect on the verdict against petitioner. *See Drayden v.*

28 |

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus      Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

11

1   *White*, 232 F.3d at 713-714 (relying in part on the strong evidence of guilt to reject misconduct

2   claim).

3   **D.   The Prosecutor Did Not Suppress Evidence That Pascali Acted As An Informant In The Past**

5   Petitioner next contends that the prosecutor suppressed evidence that Pascali had acted as

6   an informant in the past to avoid going to state prison, and had a similar motivation for testifying in

7   this case. Petition at 6m-6n; *see also* Exh. 7 at 15. Not so.

8   In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that

9   the suppression by the prosecution of evidence favorable to an accused . . . violates due process

10  where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

11  faith of the prosecution." "There are three components of a true *Brady* violation: The evidence at

12  issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

13  that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

14  must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999) (footnote omitted). Prejudice

15  requires a reasonable probability, based on all of the evidence, that the defendant would have

16  realized a more favorable verdict if the undisclosed evidence had not been suppressed. *Strickler*, 527

17  U.S. at 282, 289-290.

18  Petitioner provides no evidentiary support for his contention that Pascali acted as an

19  informant in the past. Rather, the evidence is to the contrary. Pascali was asked on cross-

20  examination if he had been "helping guards in the jail by making drug buys and that type of thing"

21  at the time of the assault in this case. 3 RT 312. The prosecutor objected, noting that "[t]his is the

22  first I've heard of any such thing" and that "I haven't been given discovery of this if this is true."

23  3 RT 312-313. The trial court ordered defense counsel to make an offer of proof before continuing

24  with such questioning. 3 RT 313.

25  Outside the presence of the jury, a hearing was conducted pursuant to California Evidence

26  Code section 402. *See* 3 RT 316-320. Defense counsel argued that on the tape of Pascali's last

27  parole hearing, he thought he heard Pascali's parole agent refer to Pascali making "buys" while in

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus

Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

1    jail. 3 RT 316. The prosecutor denied hearing any reference to "buys" on the tape. 3 RT 316.

2    Defense counsel was allowed to ask Pascali if he had ever bought or sold drugs on behalf of jail

3    authorities. 3 RT 318-319. Pascali denied helping out jail authorities in this manner. 3 RT 319.

4    At the conclusion of the hearing, the trial court granted defense counsel's request to ask Pascali the

5    same question in front of the jury based on counsel's representation that he would be calling

6    Pascali's attorney from the parole hearing to impeach Pascali's testimony. 3 RT 317, 319; *see also*

7    3 RT 325.

8         When cross-examination resumed, Pascali again denied working undercover for jail

9    authorities. 3 RT 328-329. Officer Lee also denied on cross-examination that Pascali had helped

10   out jail authorities on any other matters besides the assault case. 4 RT 422, 440. Ultimately, the

11   defense did not present the witness promised during the section 402 hearing, and no other evidence

12   was presented at trial to impeach the testimony of either Pascali or Officer Lee. *See* 5 RT 789-810.

13   In sum, petitioner has failed to show that Pascali acted as a jail informant in the past, and that such

14   evidence was suppressed by the prosecution.

15        **E.    The Prosecutor's Evidence That Pascali Did Not Testify In Exchange For**
               **Favorable Treatment At His Parole Revocation Hearing And That He**
16             **Absconded From Parole Because He Feared Retaliation By The Nortenos Was**
               **Not False And Misleading**
17

18        Petitioner next asserts that the "prosecutor's evidence and argument that Pascali did not

19   testify in exchange for favorable treatment, and that he absconded because he feared retaliation by

20   members of the "Norteno" gang, are belied by his criminal history, and were false and misleading."

21   Petition at 6R; *see also* Exh. 7 at 19. There is no merit to this claim.

22        **1.    Trial Testimony**

23        On October 10, 2000, Pascali was arrested on a parole violation for a failed drug test and

24   placed in the county jail. 3 RT 184, 194-196, 264, 298-299; 5 RT 790, 804. On October 23, 2000,

25   he received a "screening" offer of six months jail time. 3 RT 324-325, 369; 5 RT 790, 792, 805.

26   His parole agent was surprised by the offer and thought it was "very high" considering that a typical

27   offer for a failed drug test would be anywhere from no jail time up to four months. 5 RT 792, 797.

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                                 C 07-5666 MMC (PR)

13

1  Pascali rejected the offer and asked for a parole revocation hearing. 3 RT 324-325, 369-370; 5 RT

2  792. His parole agent thought it was "a smart move" to reject the offer. 5 RT 797.

3       On October 27, 2000, Pascali was still in custody awaiting his parole revocation hearing

4  when the assault in this case took place. 3 RT 184, 194-196, 264, 298-299; 5 RT 790. Immediately

5  after the assault, Pascali spoke to Officer Lee and identified the defendants as the assailants. 3 RT

6  277; 4 RT 414, 417-421, 427. Even though Pascali knew what happened to "snitches" in jail, he

7  agreed to talk to Officer Lee because he liked Langenegger, "felt bad" about what had happened to

8  him, and wanted to do the "right thing." 3 RT 304; 4 RT 432. He neither expected nor asked for

9  anything in exchange for his cooperation, and was offered nothing in return. 3 RT 304, 373; 4 RT

10  421, 430-432, 552-553; 5 RT 589-590. The only thing he did ask was that Officer Lee keep Pascali's

11  cooperation "in the back of [his] mind."  4 RT 435.

12       Officer Lee knew Pascali was in custody on a parole violation at the time he interviewed

13  him, and so he asked Pascali about his parole status. 3 RT 303; 4 RT 428-429. He did not offer to

14  help Pascali on the parole matter if he cooperated with authorities, but merely took note of his parole

15  status in order to relay that information to his supervisor. 3 RT 303-304; 4 RT 428-431, 440.

16       Pascali told Officer Lee that he was scared of the defendants and would not testify against

17  them unless he were out of custody. 3 RT 321-322; 4 RT 435, 450, 552. Because he was still in

18  custody at that time, he asked that his identity be kept a secret until after he was released from jail.

19  3 RT 372; 4 RT 421.

20       On November 8, 2000, Pascali's parole revocation hearing took place. 3 RT 286, 299,

21  325; 5 RT 790, 793. At some point before the hearing, Sergeant Tarabini, Officer Lee's superior

22  officer, informed Pascali's parole agent, Michelle Donovan, about Pascali's cooperation on the

23  assault case, but did not specifically ask for her help in getting Pascali released from custody. 5 RT

24  603-604, 806-809. On the day of the hearing, Pascali separately mentioned his cooperation with

25  authorities to Donovan. 5 RT 795, 808.

26       Donovan spoke on Pascali's behalf at the parole revocation hearing. 3 RT 286-287, 325;

27  5 RT 793. She primarily focused on Pascali's good performance on parole, but also mentioned his

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus        Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

1  cooperation with jail authorities. 3 RT 287, 325-328, 370; 5 RT 795-796. Donovan recommended

2  that Pascali be given credit for time served and ordered to complete a drug treatment program. 5 RT

3  794, 796. While she did not normally make such a recommendation, she felt it was justified in

4  Pascali's case given that most first-time parolees who fail a drug test are referred to outpatient drug

5  treatment rather than sent back to jail. 5 RT 795-796. The parole board adopted Donovan's

6  recommendation, and Pascali was released from custody that same day. 3 RT 287, 345; 5 RT 794,

7  802. In all, Pascali served approximately 30 days for the parole violation. 3 RT 299, 324; 5 RT 794.

8        In Donovan's opinion, the information about Pascali's cooperation with authorities was

9  not the primary reason for the parole board's decision and "probably [had] no bearing at all" on its

10  disposition. 5 RT 795. While Donovan mentioned it to the board because Pascali asked her to, her

11  recommendation was based solely on Pascali's good performance on parole. 5 RT 795-796. In its

12  written disposition, the parole board noted only petitioner's good performance on parole, and not his

13  cooperation with authorities, as the reason for giving him credit for time served. 5 RT 798-799.

14        Pascali, too, denied that he received any benefit at his parole revocation hearing as a result

15  of his cooperation with authorities on the assault case, and believed that the only reason why he

16  received such a favorable disposition was because of his otherwise good performance on parole. 3

17  RT 327-329, 352. Pascali testified that he would have still been willing to testify against the

18  defendants even if he had not received credit for time served at his parole revocation hearing. 3 RT

19  304-305.

20        On December 13, 2000, while he was still out of custody, Pascali testified against the

21  defendants at their preliminary hearing. 3 RT 257-259.

22        A few months later, Pascali was cited for a second parole violation—driving under the

23  influence—and released. 3 RT 260, 345-346; 5 RT 803. He knew that a person in custody who has

24  been labeled a "snitch" is often killed, and he was afraid of going back to prison if his parole were

25  revoked. 3 RT 260, 314. He therefore called the prosecutor and asked if he "could help [him] out

26  with [his] parole officer and [his] parole violation." 3 RT 260-261, 313-314. The prosecutor told

27  Pascali that he "would put in a good word for [him] at [his] parole hearing but . . . couldn't make any

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus       Carrasco v. Horel, Warden
                                                                       C 07-5666 MMC (PR)

1    promises." 3 RT 261. After talking to the prosecutor, Pascali absconded from parole. 3 RT 261,

2    346; 5 RT 802-803. The main reason why he absconded was because he was afraid he would be

3    killed if he testified against the defendants while in custody. 3 RT 261-262, 346.

4    　　　Two weeks before the trial in the assault case, Pascali was apprehended on his DUI parole

5    violation and placed in protective custody within the jail, where he was still incarcerated at the time

6    of trial. 3 RT 257, 260-262, 345, 375. He did not feel entirely safe in protective custody, and was

7    afraid of what would happen to him if he returned to state prison. 3 RT 263, 371-372. He did not

8    want to testify, and the only reason why he was present in court was because the prosecutor had

9    forced him to appear. 3 RT 257. The prosecutor made no promises to Pascali in exchange for his

10   testimony. 3 RT 286. At the time of trial, Pascali had still not received a parole revocation hearing

11   on his DUI parole violation. 5 RT 803-804. He was looking at a potential disposition ranging

12   anywhere from credit for time served up to one year in state prison. 5 RT 810.

13   　　　**2.    The Trial Testimony Was Not False And Misleading**

14   　　　Petitioner contends that the above evidence was false and misleading because "Pascali's

15   criminal record demonstrates that he had a history of absconding from and failing probation and

16   parole supervision. His actions between his testimony at [the] preliminary hearing and at trial were

17   typical, rather than being the result of fear of the alleged 'Norteno' gang." Petition at 6Q; *see also*

18   Exh. 7 at 19. However, petitioner offers no support for his contention that Pascali had a history of

19   absconding from probation and parole. In fact, the testimony at trial established that it was Pascali's

20   first time on parole. 3 RT 340, 342-344. And even if petitioner could establish that Pascali had a

21   history of absconding, such evidence would not prove that Pascali's stated reason for absconding in

22   this case—his fear of retaliation by the Nortenos—was false. Indeed, there was ample evidence to

23   support such reason—Pascali's status as a snitch, his understanding of what Nortenos did to snitches,

24   and the evidence regarding the dangerousness of the Norteno gang.

25   　　　Petitioner also contends that "[i]t was misconduct to allow the jury to believe that Pascali's

26   treatment at his November 8, 200[0] hearing did not constitute favorable treatment. In view of his

27   long criminal history, his manipulation of the criminal justice system and repeated dishonesty, it was

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                                                                           C 07-5666 MMC (PR)

1  false and misleading to equate Pascali with a 'whistle blower' who gets a reward after telling the

2  truth." Petition at 6R; *see also* Exh. 7 at 19-20. Petitioner, however, does not explain how the

3  prosecution's evidence was false and misleading. Pascali, Officer Lee, and Sergeant Tarabini all

4  denied that Pascali was promised anything in exchange for talking to jail authorities. Rather, Officer

5  Lee and Sergeant Tarabini decided on their own accord to pass along the information of Pascali's

6  cooperation to his parole agent, without asking for any special treatment in return. And while

7  Donovan passed the information along to the parole board, her recommendation and the board's

8  disposition were based on the relatively minor nature of the parole violation and Pascali's otherwise

9  good performance on parole. In sum, there is no indication in the record that Pascali received

10 favorable treatment at his parole hearing based on his cooperation in this case. The mere fact of

11 Pascali's criminal history—of which the jury was well aware, *see* 3 RT 259-261, 297-299, 305, 340-

12 346—fails to establish the falsity of such evidence.

13 **F.  The Prosecutor Did Not Introduce Involuntary Statements Or Improperly Collected Evidence**

14

15 **1.  Alleged Involuntary Statements**

16 Petitioner next claims that both his and Langenegger's statements to jail authorities after

17 the assault were involuntary and, thus, improperly admitted at trial. Petition at 6S-6V; *see also* Exh.

18 7 at 20-24. Petitioner additionally challenges his statement under *Miranda v. Arizona*, 384 U.S. 436

19 (1966). Petition at 6T; *see also* Exh. 7 at 22.

20 Under the Fourteenth Amendment, involuntary confessions are inadmissible in state

21 criminal trials. *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960). Voluntariness is evaluated by

22 reviewing both the police conduct in extracting the confession and the effect of that conduct on the

23 defendant. *Miller v. Fenton*, 474 U.S. 104, 116 (1985). Where there is no causal connection

24 between the police conduct and the confession, there is no basis for concluding that a confession was

25 involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1985).

26 In determining voluntariness, the court must look at the totality of the circumstances

27 surrounding the confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-227 (1973). "The test

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus                    Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

1    is whether, considering the totality of the circumstances, the [state] obtained the statement by

2    physical or psychological coercion or by improper inducement so that the suspect's will was

3    overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).

4            Petitioner first contends that his statement to Sergeant Tarabini was involuntary under the

5    Fourteenth Amendment because he was under the influence of methamphetamine, and Sergeant

6    Tarabini continued to interview him despite knowing this.  While Sergeant Tarabini did testify that

7    petitioner displayed outward symptoms of being under the influence of methamphetamine during

8    the interview, *see* 4 RT 548, there is no evidence that petitioner's statement was involuntary.  If a

9    confession is the product of a rational intellect and a free will, then it is voluntary regardless of the

10   defendant's intoxication.  *See Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (finding that

11   although petitioner was intoxicated at the time he gave police a statement, the statement was

12   voluntary because statement was product of rational mind and petitioner's free will).  Approximately

13   six hours had passed between petitioner's methamphetamine use and his interview with Sergeant

14   Tarabini.  *See* 4 RT 409, 547.  During the interview, petitioner was able to understand Sergeant

15   Tarabini's *Miranda* warnings.  4 RT 545-546.  He was also able to answer Sergeant Tarabini's

16   questions regarding his methamphetamine use and the attack on Langenegger. 4 RT 546-547.  Under

17   these circumstances, there is no evidence that petitioner's statement was not the product of a rational

18   mind and free will.

19           Petitioner next contends that his statement to Sergeant Tarabini violated the Fifth

20   Amendment because he did not expressly waive his *Miranda* rights.  Petitioner raised this same

21   argument in the trial court, where a hearing was held pursuant to California Evidence Code section

22   402.  During the hearing, Sergeant Tarabini testified that as he read petitioner his *Miranda* rights,

23   petitioner kept interrupting him, insisting he already understood his rights.  4 RT 534.  Sergeant

24   Tarabini continued to give petitioner a complete *Miranda* admonishment, and when he was done,

25   he asked petitioner if he understood his rights.  4 RT 534.  Petitioner said yes, and began answering

26   Sergeant Tarabini's questions regarding the assault.  4 RT 534-535.  Petitioner did not invoke his

27   *Miranda* rights during the interview.  4 RT 535.  Based on Sergeant Tarabini's testimony, the trial

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                                C 07-5666 MMC (PR)

18

1    court found that petitioner had impliedly waived his *Miranda* rights. 4 RT 539.

2          Under *Miranda*, a waiver can be either express or implied. *North Carolina v. Butler*, 441

3    U.S. 369, 373 n.4 (1979). The record of the section 402 hearing supports the trial court's finding

4    of an implied waiver in this case. Petitioner indicated that he understood his rights even before

5    Sergeant Tarabini had finished with the *Miranda* warning. Afterward, petitioner expressly

6    acknowledged that he understood his rights and voluntarily answered Sergeant Tarabini's questions

7    without invoking his *Miranda* rights. Petitioner's decision to talk to Sergeant Tarabini while at the

8    same time understanding his *Miranda* rights supports the trial court's finding of an implied waiver.

9    *See Ylst v. Nunnemaker*, 501 U.S. at 801-806 (federal habeas court looks to the last reasoned state

10   court decision in deciding the petition); *Shackleford v. Hubbard*, 234 F.3d at 1079 n.2 (same).

11         We next address petitioner's claim regarding Langenegger's statements to Officer Lee and

12   Sergeant Tarabini. "In general, [a defendant] does not have standing to challenge a violation of

13   another's rights; however, illegally obtained confessions may be less reliable than voluntary ones,

14   and thus using a coerced confession at another's trial can violate due process." *Douglas v. Woodford*,

15   316 F.3d 1079, 1092 (9th Cir. 2003). However, habeas relief is warranted only if the admission of

16   such statement "rendered the trial so fundamentally unfair as to violate due process." *Williams v.*

17   *Woodford*, 384 F.3d 567, 593 (9th Cir. 2004).

18         Here, there is no indication that Langenegger's statements to jail authorities were

19   involuntary, and thus, unreliable. Petitioner makes the unsubstantiated allegation that jail officials

20   withheld medical treatment from Langenegger for five days in order to coerce him into giving a

21   statement. *See* Petition at 6U; *see also* Exh. 7 at 23. However, the record is clear that outside

22   hospital officials were the ones who denied Langenegger treatment after the attack, *see* 3 RT 190,

23   203, 392, and there is no evidence that the treatment was denied simply to coerce Langenegger to

24   talk to jail authorities. While Langenegger was admittedly in pain at the time he was interviewed

25   by Officer Lee and Sergeant Tarabini, 3 RT 190-192; 4 RT 415-417, 432-433, 543-544, the

26   interviews each lasted only one or two minutes at most. 3 RT 210-211; 4 RT 432. Moreover, both

27   officers were able to understand Langenegger when they spoke to him. 4 RT 433, 540-541. In

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

1  addition, Langenegger clearly remembered being interviewed by both officers, and gave no

2  indication that his statements to them were involuntary. 3 RT 210-212. Under these circumstances,

3  it cannot be said that the admission of Langenegger's statements violated due process.

4        Even if there were error in the admission of either of these statements, such error would

5  be subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 306-312 (1991). Habeas

6  relief is appropriate only if the involuntary statement had a "'substantial and injurious effect or

7  influence in determining the jury's verdict.'" *Pope v. Zenon*, 69 F.3d 1018, 1025 (9th Cir. 1995)

8  (quoting *Brecht v. Abrahamson*, 507 U.S. at 637). Here, Pascali's testimony alone established that

9  the Nortenos attacked Langenegger, and that petitioner was the one to initiate the attack. Pascali's

10 testimony was consistent with his statement to jail authorities immediately after the attack, and his

11 credibility was not seriously impeached at trial. Moreover, Langenegger's spontaneous statement

12 to Officer Lee immediately after the attack—that petitioner called him to the front of the cell and the

13 Nortenos attacked him, 4 RT 412—corroborated Pascali's testimony. As for petitioner's contention

14 that there would have been no evidence as to the reason for the attack without his and Langenegger's

15 statements, we note that the motive behind the attack was not an element of either the assault or

16 battery. Further, because petitioner's gang enhancement was reversed by the California Court of

17 Appeal, petitioner could have suffered no substantial or injurious effect as the result of any lack of

18 evidence regarding the motivation for the attack. Accordingly, petitioner is not entitled to habeas

19 relief on this claim.

20        **2.    Alleged Improper Collection Of Evidence**

21        Petitioner next challenges Sergeant Tarabini's practice of gathering evidence from his

22 officers and memorializing their findings, along with his own, in one report. Petition at 6V-6X; *see*

23 *also* Exh. 7 at 24-26. Petitioner cites only one case in support of his argument, *Kyles v. Whitley*, 514

24 U.S. 419, 446-448 & n.15 (1995). In that case, the prosecution failed to disclose exculpatory

25 evidence discovered during a police investigation. Here, by contrast, petitioner does not contend that

26 the prosecution withheld evidence from the investigation conducted by jail authorities. Rather, he

27 takes issue with the manner in which such evidence was memorialized by Sergeant Tarabini.

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

20

1    However, petitioner and his co-defendants were able to cross-examine both Sergeant Tarabini and

2    Officer Lee about the findings of their investigation, as well as their methods for recording those

3    findings. *See* 4 RT 424-425; 5 RT 586-588, 591-592, 605, 621. Petitioner's rights to the discovery

4    of exculpatory material, to the effective assistance of counsel, and to confront and cross-examine the

5    witnesses against him were not therefore violated.

6

7                                          **II.**

8                        **TRIAL COUNSEL WAS NOT INEFFECTIVE**

9            Petitioner contends that trial counsel was ineffective for failing to do the following: (1)

10   moving to exclude petitioner's and Langenegger's statements to Sergeant Tarabini as coerced and

11   unreliable; (2) investigating Pascali's record and background further and impeaching him with the

12   resulting information, as well as objecting to the prosecutor's evidence and argument regarding

13   Pascali's credibility; (3) presenting an expert witness to discredit Sergeant Tarabini's investigative

14   procedures; (4) investigating Langenegger's "change in testimony" regarding when his jaw was

15   broken; and, (5) presenting a gang expert to rebut the testimony of the prosecution's gang expert.

16   Petition at 6X-6Z; *see also* Exh. 7 at 26-28. Like his prosecutorial misconduct claims, petitioner

17   raised his ineffectiveness claims for the first time on state habeas. Accordingly, there is no reasoned

18   state court decision addressing his ineffectiveness claims. We address each claimed instance of

19   ineffective assistance of counsel in turn below.

20           In order to prevail on a claim of ineffective assistance of counsel, a defendant must

21   establish that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

22   there is a reasonable probability that, but for counsel's errors, he would have received a more

23   favorable result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On federal habeas, a

24   petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively

25   unreasonable manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam).

26           Petitioner cannot satisfy the first prong of a *Strickland* claim with regard to any of his

27   claims of ineffective assistance of counsel. First, counsel was not ineffective for failing to seek

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

1   exclusion of petitioner's and Langenegger's statements to Sergeant Tarabini as coerced and

2   unreliable because, as set forth above in Argument I.F.1, there is no legal merit to such arguments.

3   The failure to bring a motion does not constitute ineffectiveness if the motion is based on a meritless

4   argument. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Juan H. v. Allen*, 408 F.3d 1262,

5   1273 (9th Cir. 2005); *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir.1999); *Rupe v. Wood*, 93 F.3d

6   1434, 1445 (9th Cir.1996).

7           Second, counsel was not ineffective for relying on Pascali's criminal record to impeach

8   him without conducting a further investigation into his background. Petitioner's argument "does not

9   involve a failure to investigate, but, rather, petitioner's dissatisfaction with the degree of . . . [his]

10  attorney's investigation . . . ." *Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993). "[C]ounsel

11  has a duty to make reasonable investigations or to make a reasonable decision that makes particular

12  investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate

13  must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of

14  deference to counsel's judgments." *Id.* Assuming that counsel did not conduct an additional

15  investigation in this case, petitioner has not shown that such decision was unreasonable given

16  counsel's thorough impeachment of Pascali based on his criminal record. Nor has petitioner alleged

17  what additional facts counsel would have discovered had he conducted such investigation, or that

18  such information would have led to a more damaging impeachment of Pascali. *See United States*

19  *v. Schaflander*, 743 F.2d 714, 721 (9th Cir. 1984) (to succeed on an ineffective assistance claim, a

20  petitioner must make a sufficient factual showing to substantiate his claims). As to petitioner's

21  subsidiary claim that counsel should have objected to the prosecution's evidence and argument

22  regarding Pascali's credibility and motivation for testifying, we note that there was no legal basis for

23  such objection, as set forth in Arguments I.B. and I.E. "[T]rial counsel cannot have been ineffective

24  for failing to raise a meritless objection." *Juan H. v. Allen,* 408 F.3d at 1273.

25          Third, counsel was not ineffective for failing to call an expert on investigative procedures

26  because he was able to effectively cross-examine Sergeant Tarabini on the subject. *See Smith v.*

27  *Angelone*, 111 F.3d 1126, 1132-1133 (4th Cir. 1997) (counsel not incompetent for failing to call

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

22

1    defense expert where counsel obtained the same information and pursued the same defense via cross-

2    examination of prosecution experts).

3          Fourth, counsel was not ineffective in failing to investigate the alleged inconsistency in

4    Langenegger's testimony regarding when his jaw was broken.  As an initial matter, we note that

5    petitioner does not specify where in the record Langenegger allegedly changed his testimony

6    regarding when his jaw was broken. *See United States v. Schaflander*, 743 F.2d at 721 (to succeed

7    on an ineffective assistance claim, a petitioner must make a sufficient factual showing to substantiate

8    his claims).  In any event, counsel was not ineffective for relying on both Langenegger's and Officer

9    Zuger's testimony that Langenegger's jaw was broken in the attack. *See* 3 RT 190, 392.

10         Finally, counsel was not ineffective for failing to call his own gang expert.  Given that the

11   prosecution's gang evidence could not be seriously disputed, counsel's decision not to call his own

12   expert was reasonable. *Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001) (calling an expert

13   witness may be ineffective where it paves the way for devastating cross-examination); *Harris v.*

14   *Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) (trial counsel not ineffective for failing to call expert

15   who could be subjected to cross-examination based upon equally persuasive contrary opinions);

16   *Shumate v. Newland*, 75 F.Supp.2d 1076, 1093 (N.D. Cal. 1999) (no ineffectiveness where counsel

17   believed that expert's testimony would be too easily discounted by the prosecution).  Nor has

18   petitioner provided any evidence that his proposed gang expert would provide favorable testimony.

19   *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (in absence of declaration, "speculation

20   about what an expert could have said is not enough to establish prejudice" for Sixth Amendment

21   claim).

22         Petitioner has also failed to establish that he suffered any prejudice as a result of any of

23   counsel's alleged omissions.  It is difficult to see how any the alleged errors petitioner complains

24   about would have resulted in a more favorable verdict.  Accordingly, petitioner's ineffectiveness

25   claims fail.

26   ///

27

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                    C 07-5666 MMC (PR)

23

## III.

## THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON AIDING AND ABETTING

Petitioner asserts that the trial court's instructions regarding aiding and abetting violated his right to due process because they did not define the terms felonious assault, felonious battery, and misdemeanor assault as used in CALJIC No. 3.02, or specify whether the crimes were misdemeanors or felonies. Petition at 6AA; *see also* Exh. 4 at 20. Petitioner raised this claim on direct appeal, and the California Court of Appeal issued a reasoned decision rejecting the claim. *See* Exh. 3 at 18-21. The Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### A.   Instructions On Aiding And Abetting

The trial court instructed the jury with CALJIC Nos. 3.01 and 3.02 as follows:

A person aids and abets the commission or attempted commission of a crime when he:

One. With knowledge of the unlawful purpose of the perpetrator; and

Two. With the intent of purpose of committing or encouraging or facilitating the commission of the crime; and

Three. By act or advice aids, promotes, encourages, or instigates the commission of the crime.

A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime.

Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

One who aids and abets in the commission of a crime or crimes is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by the principal which is a natural and probable consequence of the crimes originally aided and abetted.

In order to find the defendant guilty of the crimes as charged in Counts 1 or 2, you must be satisfied beyond a reasonable doubt that:

One. The crime or crimes of misdemeanor assault and/or battery was or were committed;

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus        Carrasco v. Horel, Warden
C 07-5666 MMC (PR)

24

1      Two.  That the defendant aided and abetted those crimes;

2      Three.  That a coprincipal in that crime committed the crime of felonious
       assault or battery;

3

4      Four.  The crimes of felonious assault and/or battery were a natural and
       probable consequence of the commission of the crimes of misdemeanor assault
       and/or battery.

5

6    6 RT 973-975; 2 CT 458-459.

7    **B.    California Court Of Appeal Opinion**

8          The California Court of Appeal found no instructional error.  It concluded that the trial

9    court instructed the jury as to the elements of assault, assault by means of force likely to produce

10   great bodily injury, and battery with serious bodily injury.  *See* Exh. 3 at 20.  It additionally found

11   that the trial court identified each of these crimes as misdemeanors or felonies.  *Id.*  Citing *Estelle*

12   *v. McGuire*, 502 U.S. 62, 72 (1991), the court found "no reasonable likelihood that the jury

13   misunderstood these instructions." *Id.* at 21.

14   **C.    The Aiding And Abetting Instructions Did Not Violate Due Process**

15         The California Court of Appeal's decision was not contrary to, or an unreasonable

16   application of, clearly established Supreme Court precedent.  A claim of state instructional error can

17   be the basis of federal habeas relief only if the error, considered in light of all the instructions given,

18   "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire,*

19   502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  The test for constitutional

20   error is whether there is a "reasonable likelihood" the jury misapplied the instructions.  *Id.*

21         Petitioner claims that the trial court failed to define the terms felonious assault, felonious

22   battery, and misdemeanor assault as used in its aiding and abetting instructions, and also failed to

23   specify whether the crimes were misdemeanors or felonies.  Petitioner's claim fails because the jury

24   was given the proper definitions of misdemeanor assault, felony assault, and felony battery elsewhere

25   in the court's instructions.

26         Immediately after instructing the jury on the principles of aiding and abetting, the court

27   instructed the jury that "the crime of assault, in violation of Penal Code section 240, *a misdemeanor*,

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus                    Carrasco v. Horel, Warden
                                                                                                   C 07-5666 MMC (PR)

25

1   is a lesser crime included in the crime charged in Count 1. . . Assault has been previously described

2   for you following the elements of assault by means of force likely to produce great bodily injury."

3   6 RT 975, emphasis added.  As was pointed out to the jury, the court had previously instructed the

4   jury with CALJIC No. 9.00.  *See* 6 RT 963-964.  Thus, the jury was properly instructed as to

5   elements of misdemeanor assault.

6           Moreover, immediately before instructing the jury on the elements of counts one and

7   two—assault by means of force likely to cause great bodily injury and battery with serious bodily

8   injury—the court instructed the jury that "[t]he Information in this case alleges that each defendant

9   committed two felonies. . . ."  6 RT 962-963, 965.  The jury was therefore also properly instructed

10  as to the elements of felony assault and felony battery.  Based on the instructions on the whole, there

11  is no reasonable likelihood that the jury misunderstood the court's aiding and abetting instructions

12  in the manner suggested by petitioner.  *Estelle v. McGuire*, 502 U.S. at 72.  No due process violation

13  is shown.

14

15                                                      **IV.**

16          **PETITIONER'S CLAIM OF STATE LAW SENTENCING ERROR IS**
            **NOT    COGNIZABLE    ON    FEDERAL    HABEAS;    EVEN    IF**
17          **COGNIZABLE, THE CLAIM LACKS MERIT**

18          Petitioner contends that the trial court abused its discretion under state law by refusing to

19  dismiss his prior strike convictions.  Petition at 6AF-6AI; *see also* Exh. 4 at 26-29.  Petitioner's

20  claim, however, involves only a question of state law, and is not cognizable on federal habeas.  Even

21  if cognizable, the California Court of Appeal rejected the claim on direct review, *see* Exh. 3 at 24-27,

22  and such decision was not contrary to, nor an unreasonable application of, clearly established law.

23  **A.    Sentencing Hearing**

24          At sentencing, petitioner brought a motion to dismiss his prior strike convictions.  8 RT

25  1077-1081.  The trial court denied the motion.  8 RT 1085.

26  **B.    California Court Of Appeal Opinion**

27          The California Court of Appeal ruled that the trial court did not abuse its discretion under

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

1   state law by refusing to dismiss the prior strike convictions. Exh. 3 at 26. The court found that "a

2   review of the record, including the probation report, shows no arbitrary or irrational decision by the

3   trial court." *Id.* In support of its decision, the court noted petitioner's extensive criminal history,

4   including his prior strikes for vehicular manslaughter; his repeated incarcerations since the time he

5   was 21 years old; his previous poor performance on parole; the fact that petitioner's assault on

6   Langenegger occurred while petitioner was in custody awaiting sentencing in another case; and his

7   failure to take responsibility for the assault. *Id.*

8   **C.    The Claim Is Not Cognizable; In The Alternative, It Lacks Merit**

9   A federal court considering a habeas petition by a state prisoner is limited to deciding

10  whether the petitioner's conviction violates the federal constitution. 28 U.S.C. § 2254(a). Habeas

11  relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *see also*

12  *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (federal habeas relief "unavailable for

13  alleged error in the interpretation or application of state law"). The Ninth Circuit has refused to

14  consider errors in the application of state sentencing law on federal habeas. *See, e.g., Souch v.*

15  *Schaivo*, 289 F.3d 616, 623 (9th Cir. 2002); *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994);

16  *Miller v. Vasquez*, 868 F.2d 1116, 1118-1119 (9th Cir. 1989). Here, petitioner makes no references

17  to federal law in setting forth his claim. *See* Petition at 6AF-6AI; *see also* Exh. 4 at 26-29.

18  Accordingly, his claim is not cognizable on federal habeas.

19  Even if the claim is cognizable, petitioner has failed to show that the California Court of

20  Appeal's decision was contrary to, or an unreasonable application of, clearly established Supreme

21  Court authority. The misapplication of state sentencing law violates due process only if the resulting

22  sentence is arbitrary and capricious. *Richmond v. Lewis*, 506 U.S. 40, 50 (1992). In determining

23  whether to exercise its discretion to dismiss petitioner's prior strike convictions, the trial court

24  reviewed the probation report and heard the arguments of counsel. *See* 8 RT 1077-1085. The

25  probation report demonstrates that petitioner "has spent most of his time in prison," since he was 21

26  years old. 3 CT 680. His record "consists of 9 felonies and 11 misdemeanors." 3 CT 681. At least

27  two of the prior felonies qualified as strikes. 3 CT 681. Petitioner explained to the probation officer

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

1  "that he went to prison for manslaughter after killing 2 friends in a car accident. After his release,

2  he stayed out of custody for 9 months before being violated for possession of [a] controlled

3  substance. He was again released, but returned to custody 1 month later, again for drug possession."

4  3 CT 680. At the time of the assault on Langenegger, petitioner was in custody awaiting sentencing

5  for possession of narcotics for sale. 3 CT 678. Less than a month later, petitioner was sentenced to

6  a nine-year prison term on that case. 3 CT 678. Notably, the possession for sale case was originally

7  charged as a three strikes case, and as part of his plea, the court dismissed one of the strikes. *See* 8

8  RT 1082, 1084. Regarding the current incident, Carrasco continued to deny any responsibility for

9  the assault and denied being in a gang. 3 CT 680.

10      Based on this record, the trial court did not act arbitrarily or capriciously in determining

11  that—based on petitioner's prior criminal history and incarcerations, his previous poor performance

12  on parole, the circumstances of his current crime, the fact that he was already in custody when the

13  current crime took place, and his failure to take responsibility for his actions—dismissal of the prior

14  strike convictions was unwarranted. Accordingly, no due process violation is shown.

15  ///

16  ///

17  ///

18

19

20

21

22

23

24

25

26

27

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)

1

**CONCLUSION**

2      Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

3  be denied.

4          Dated:  August 28, 2008

5                                    Respectfully submitted,

6                                    EDMUND G. BROWN JR.
                                     Attorney General of the State of California
7
                                     DANE R. GILLETTE
8                                    Chief Assistant Attorney General

9                                    GERALD A. ENGLER
                                     Senior Assistant Attorney General

10                                   PEGGY S. RUFFRA
                                     Supervising Deputy Attorney General
11

12                                   /s/ Michele J. Swanson
                                     MICHELE J. SWANSON
13                                   Deputy Attorney General

14                                   Attorneys for Respondent

15  20132452.wpd
    SF2008401285

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Carrasco v. Horel, Warden
                                                                                        C 07-5666 MMC (PR)