IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER A. CARRASCO,          )          No. C 07-5666 MMC (PR)
                                  )
          Petitioner,             )
                                  )          **ORDER DENYING PETITION FOR**
v.                                )          **WRIT OF HABEAS CORPUS;**
                                  )          **DENYING CERTIFICATE OF**
ROBERT A. HOREL, Warden,          )          **APPEALABILITY**
                                  )
          Respondent.             )
_____   )

          Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant

to 28 U.S.C. § 2254 by petitioner Christopher A. Carrasco, who proceeds pro se, and which

challenges the validity of a judgment obtained against him in state court.  Respondent has

filed an answer to the petition, and petitioner has filed a traverse.

## I.  PROCEDURAL HISTORY

          In 2001, in the Superior Court of Santa Clara County, petitioner was convicted of

assault by means of force likely to produce serious bodily injury, battery with serious bodily

injury, and use of a controlled substance.  (CT at 480-82.)  Additionally, the jury found true

an allegation that the assault and battery were committed for the benefit of a criminal street

gang (id.), and petitioner admitted three prior strike convictions, one prior serious felony

conviction, and three prior prison terms (CT at 469, 489).  Petitioner was sentenced to a term

of thirty-three years to life in state prison.  (CT at 769, 772-74.)

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

In 2005, the California Court of Appeal reversed the gang enhancement but otherwise affirmed the judgment. (Ex. 3.)[1] The limited reversal reduced petitioner's sentence to thirty years to life in state prison. (See CT at 769.)

The California Supreme Court denied petitioner's petition for review, but granted the State's petition for review (Exs. 4-6) and deferred further action in the matter pending resolution of a related issue in People v. Modiri, S120238 (Ex. 6). Additionally, the California Supreme Court denied petitioner's state petition for writ of habeas corpus. (Exs. 7-8.)

In 2007, the California Supreme Court remanded the case to the California Court of Appeal for reconsideration of its earlier opinion, in light of the California Supreme Court's ruling in People v. Modiri, 39 Cal. 4th 481 (2006), which case addressed the question of jury instructions as to great bodily injury enhancements. (Ex. 9.) The Court of Appeal thereafter vacated a portion of its previous opinion with respect to one of petitioner's co-defendants, but left intact its ruling as to petitioner. (Ex. 10.) Petitioner did not seek review of the Court of Appeal's opinion on remand.

On November 7, 2007, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> On October 27, 2000, Charlie Langenegger was serving time in Santa Clara County Jail, and housed in a 16-man cell, with four of the named defendants (Gustavo Castenada, Jerry Patlan, Steven Pena and Andres Perez) and others. Defendant Christopher Carrasco [petitioner] was housed in a four-person cell across the walkway. Langenegger worked as a barber in the jail and as such, was given certain privileges, including being allowed to go to different parts of the facility.
>
> That night, Langenegger was asleep on his bunk, when he was awakened by someone calling his name. He went to the front gate of the cell and was hit multiple times from behind. According to his testimony at trial, he did not see who hit him, but could tell that there was more than one person involved. Langenegger was hit and kicked numerous times, and eventually yelled to the

---

[1] All references to exhibits herein are to exhibits submitted by respondent in support of the answer.

guard, "Man down."

Correctional Officer Lee testified that he responded to the call and found Langenegger holding on to the cell gate and looking dazed. He reported that Langenegger said: "'Chris called me to the gate. I got out of bed, and Norteños jumped me.'" Officer Lee took Langenegger to another location, and then investigated the incident. In the cell, he noticed defendant Patlan breathing rapidly.

At trial, Osvaldo Pascali, a cellmate who witnessed the attack, testified. He said that [petitioner] called Langenegger to the gate, and Perez hit him in the head from behind. Pascali said that Pena, Patlan and Castenada joined the attack and kicked and punched Langenegger, as he fell to his knees and then to the ground. Pascali reported the same details to Officer Lee. Pascali also said he was afraid for his safety as a result of his testimony. He testified that he was currently in protective custody within the jail, but still did not feel adequately protected. He said that a person who is labeled a "snitch" is often killed.

Sergeant Marc Tarabini, a jail supervisor, called Langenegger after he was sent to the emergency room. When Sergeant Tarabini asked who had attacked him, Langenegger refused to give names, saying he was afraid of the Norteños. Langenegger told Tarabini that the Norteños "run the tier and run the whole place." He said that he was being pressured by Norteños to run "kites" (messages passed by inmates) to the maximum security area and that he had refused.

When Langenegger returned from the hospital, Officer Lee contacted him and gave him the names of the defendants, and asked if they were the ones who attacked him. According to Officer Lee, Langenegger nodded his head and thanked him.

At trial, Langenegger denied making any of the statements about the attack as reported by Tarabini or Lee. He testified that his only statements were that he did not know who attacked him. He also admitted to a code of silence in prison, and said that an inmate testifying against another inmate would be stabbed. He said that protective custody does not provide protection from this type of retaliation. Langenegger also testified as to his injuries: his jaw was broken, it was wired shut for four months, and required several surgeries. He also suffered extensive bruising and a chipped hip bone.

Also at trial, Sergeant Tarabini testified about an interview he had with [petitioner] on the night of the incident. According to Tarabini, [petitioner] admitted that he had called Langenegger to the gate because Langenegger had "[d]isrespected a Norteño gang member" and "had to be checked." Sergeant Tarabini also noticed that [petitioner] appeared to be under the influence of a stimulant, and [petitioner] admitted using methamphetamine that night.

Various law enforcement officers testified at trial concerning the evidence of gang membership accumulated on each of the defendants.

Sergeant David Miranda qualified as a gang expert with the Department of Corrections, and explained that "The Machine" is a regimented exercise program performed by Norteño gang members while in custody. Sergeant Miranda testified in detail about the origins of the Norteño gang especially in prison. He explained membership requirements, as well as specific tattoos and the color red as common symbols. He further opined that, based on the facts of

United States District Court

For the Northern District of California

the case, he believed that the assault on Langenegger was carried out with the specific intent to promote and further Norteño gang activity.  He also found significant [petitioner's] statement to Sergeant Tarabini, that Langenegger had "disrespected a Norteño gang member" and "had to be checked."  This statement showed the attack was gang-related, according to Miranda.

Several defendants presented witnesses at trial.  Defendant Perez testified himself and stated that he was not a Norteño gang member and did not know the defendants when he was first placed in cell 336.  He also testified that he called Langenegger to the bars, and as Langenegger approached, Perez punched him in the mouth.  As Langenegger staggered, Perez continued to punch him, and he denied that anyone else was involved in the assault.  Perez explained that about 20 minutes before the assault, he learned that Langenegger had previously been convicted of rape.  Perez's younger sister had been raped and he was upset that the rapist was released after only a year in custody.  Perez's mother Alice testified, and confirmed the details surrounding the sister's rape.  She also testified that she had never known Perez to be involved in a gang, and that before he was incarcerated, he was working 12 to 14 hours a day.  Correctional Officer Dennis Cortez also testified that he was a long-time friend of Perez's and had never known him to be involved in a gang.

Defendant Patlan called Parole Agent Michelle Donovan as a witness to give details about Osvaldo Pascali's parole hearing on November 8, 2000.  Agent Donovan testified that Pascali was returned to custody on a parole violation on October 10, 2000, and at his hearing on November 8, he received credit for time served and was released.  She admitted that she had mentioned to the parole hearing officer that Pascali had cooperated in the investigation of five other inmates, but she did not believe that fact had any bearing on the result of the parole hearing.

Defendant Pena presented evidence that there were 16 people housed in cell 336 on the night of the incident, and that seven of them were believed to be gang members.

Defendants were all charged with assault by means of force likely to produce great bodily injury (Pen.Code, § 245, subd. (a)(l); count I), and battery with serious bodily injury (§ 242, 243, subd. (d); count 2).  The information also alleged personal infliction of great bodily injury and offenses committed for the benefit of a criminal street gang.  (§ 12022.7, 1 86.22, subd. (b)(l).)  (Prior convictions and strikes were also individually alleged.)  A jury found the defendants guilty as charged.

(Ex. 3 at 2-5.)

## III. DISCUSSION

A.    Standard of Review

       This Court may entertain a petition for a writ of habeas corpus "in behalf of a person

in custody pursuant to the judgment of a State court only on the ground that he is in custody

in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a);

Rose v. Hodges, 423 U.S. 19, 21 (1975).

United States District Court

For the Northern District of California

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict."  Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Id. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

United States District Court

For the Northern District of California

1    Here, on state habeas review, the state Supreme Court did not reach the merits of the

2  claims petitioner raises in the instant petition.  (Ex. 8.)  The state Court of Appeal, however,

3  in its opinion on direct review (Ex. 3), addressed two of the claims petitioner raises herein.

4  The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned

5  decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews.

6  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085,

7  1091-92 (9th Cir. 2005).  As to the claims for which there is no reasoned opinion available,

8  the United States Supreme Court has recently clarified that a federal habeas court, in

9  applying the review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the

10  highest state court, and that the absence of reasoning does not prevent application of the

11  standard of review set forth in      § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770,

12  784-85 (2011).

13  B.    Petitioner's Claims

14    Petitioner claims his conviction and sentence are invalid because: (1) the prosecutor

15  knowingly presented false evidence and perjured testimony, inflamed the jury against

16  petitioner during closing argument, and suppressed material exculpatory evidence; (2) certain

17  evidence at trial was obtained through improper investigation; (3) petitioner was denied

18  effective assistance of counsel; (4) the trial court's instructions to the jury were erroneous;

19  and (5) the trial court improperly refused to strike one of petitioner's prior convictions for

20  sentencing purposes.  The Court addresses each claim in turn, including any sub-claims

21  contained therein.

22        1.    Prosecutorial Misconduct

23            a.    False Evidence/Gang Membership

24    Petitioner claims the prosecution, through the testimony of Officer Miranda,

25  knowingly introduced false evidence of petitioner's gang membership, in support of the gang

26  enhancement.

27    Specifically, petitioner claims Officer Miranda's testimony that the Norteño prison

28  gang is a "monolithic northern California Hispanic prison gang" was "false and misleading"

because "there is no single 'Norteño' prison gang operating in California." (Pet. at 6G.)
Petitioner asserts the term "Norteño" is a custodial designation for Hispanic inmates from
Northern California rather than a gang identification. (Id.)

A prosecutor violates due process by obtaining a conviction through evidence known
to the prosecution to be false or misleading. Napue v. Illinois, 360 U.S. 264, 269 (1959). To
succeed on a false evidence claim, a petitioner must show: "(1) the testimony (or evidence)
was actually false, (2) the prosecution knew or should have known that the testimony was
actually false, and   (3) . . . the false testimony was material." Hayes v. Brown, 399 F.3d
972, 984 (9th Cir. 2005).

Petitioner's claim fails at the first step, as petitioner fails to submit any evidence to
substantiate his assertions regarding the meaning and usage of the word "Norteño," whether
from a gang expert or any other source suggesting petitioner's definition should be accepted
to the exclusion of that proferred by Officer Miranda. Consequently, petitioner fails to show
the testimony was "actually false."

Further, petitioner fails to satisfy the second Hayes requirement, that the prosecution
knew or should have known the testimony was false. Petitioner cites generally to Officer
Lee's preliminary hearing testimony as evidence the prosecution knew Officer Miranda's
trial testimony was false. (Pet. at 6G-6H.) A review of both officers' testimony, however,
shows they were consistent.

Officer Lee testified at the preliminary hearing he was working as a correctional
officer at the Santa Clara County jail on the night of the assault. (CT at 74-75.) He also
qualified as an expert on the subject of prison gangs inside the Santa Clara County jail. (Id.
at 80.) He described the Norteño gang as an organized Hispanic gang from Northern
California that operates both inside and outside the Santa Clara County jail. (Id. at 81.)
According to Officer Lee, the gang is made up of members from different "sets," or
neighborhoods, and that in custody, Norteños affiliate with the Nuestra Familia prison gang.
(Id. at 103.)

Officer Miranda testified at trial he was a correctional officer at San Quentin State

United States District Court

For the Northern District of California

1  Prison.  (RT at 621-22.)  He qualified as an expert witness on the subject of gangs.  (Id. at

2  624, 632.)  He testified that before 1998, Norteño was simply a geographic term used by state

3  prison inmates to identify which part of California they were from (id. at 627, 632), but that

4  after 1998, the term Norteño came to be applied to a Northern California Hispanic gang that

5  arose out of the Nuestra Familia and Northern Structure prison gangs (id. at 632-36).

6  According to Officer Miranda, the Norteño gang is made up of members from different

7  "regiments," organized by area or city (id. at 665), and that inside prison, the Norteño gang

8  encompasses both the Northern Structure and Nuestra Familia prison gangs (id. at 632-35,

9  645-46).

10        When the testimony of the two officers is compared, it is clear both testified there

11  exists a Norteño gang comprising an organization of several Northern California Hispanic

12  gangs, and that "Norteño" is not simply a geographic term to describe the region of the state

13  an inmate is from.  Consequently,  there is no support in the record for petitioner's argument

14  the prosecution knew or should have known Officer Miranda's testimony was false in light of

15  Officer Lee's earlier testimony.

16        Petitioner also points to Officer Miranda's reliance on "tattoos as evidence of gang

17  membership."  (Pet. at 6H.)  Citing Madrid v. Gomez, 889 F. Supp. 1146, 1242 (N.D. Cal.

18  1995), petitioner argues such testimony was false and misleading because tattoos alone

19  cannot be used by state prison authorities to validate an inmate's gang membership.  See

20  Madrid, 889 F. Supp at 1242, (noting, to "validate" inmate as gang member, California

21  Department of Corrections regulations require prison official to identify three independent

22  sources of evidence).  Nothing in Madrid, however, precludes a witness, such as Officer

23  Miranda, from basing his opinion on tattoos.  Moreover, Officer Miranda did not rely solely

24  on tattoos in support of his opinion.  A review of the record shows Officer Miranda

25  considered all of the evidence surrounding the assault, including the way the attack was

26  carried out, the fact the victim had been asked to "pass kites" for the Norteños, and the fact

27  the victim refused to give names.  (RT at 690-704.)  Further, Officer Miranda testified

28  petitioner's particular tattoos, in contrast to those of the other defendants, could not be used

8

United States District Court

For the Northern District of California

1  to show gang affiliation.  (RT at 673.)  In short, the tattoo evidence does not show the

2  prosecution knew or should have known of the falsity of Officer Miranda's testimony.

3       Finally, petitioner fails to show the "false testimony" was material, the third <u>Hayes</u>

4  requirement.  As discussed above, the California Court of Appeal reversed the judgment

5  against petitioner to the extent it included a gang enhancement.

6       Accordingly, petitioner is not entitled to habeas relief on this claim.

7            b.   <u>Perjured Testimony/Pascali</u>

8       Petitioner claims Pascali's testimony identifying the defendants as the assailants was

9  known to the prosecutor to be false and misleading.  In particular, petitioner asserts that, at

10  trial, Pascali falsely identified Patlan rather than Perez as the first person to assault

11  Langenegger, contradicting Pascali's original statement to Officer Lee identifying Perez as

12  the initial assailant.  (Pet. at 6I.)  Petitioner also asserts Pascali falsely identified Castenada as

13  one of the assailants, contradicting the post-trial declaration of Castenada's cellmate, Roman

14  Rodriguez Lara ("Lara"), stating Castenada was not involved in the attack.  (Pet at 6I.)

15       A review of the record of the trial testimony shows Pascali, while initially identifying

16  Patlan as the first attacker, thereafter changed his testimony after remembering Perez was

17  actually the first person to attack Langenegger.  (RT at 271-72.)  Pascali's testimony thus

18  was consistent with his statement to Officer Lee (<u>see</u> RT at 419-21), and there is no support

19  for petitioner's claim Pascali testified falsely on this point.  Moreover, "'mere inconsistencies

20  in testimony by government witnesses do not establish knowing use of false testimony.'"

21  <u>Henderson v. Campbell</u>, 2007 WL 781966 at *20 (N.D. Cal. 2007) (quoting <u>Coe v. Bell</u>, 161

22  F.3d 320, 343 (6th Cir. 1998)); <u>see also</u> <u>United States v. Zuno-Arce</u>, 44 F.3d 1420, 1423 (9th

23  Cir. 1995) (finding no evidence of prosecutorial misconduct where discrepancies in

24  testimony could as easily flow from misrecollection as from lies).

25       Lara's post-trial declaration likewise is of no assistance to petitioner.  Lara submitted

26  the declaration in support of co-defendant Castenada's state habeas petition.  (Pet. Ex. A.)

27  Lara states therein he was Castenada's cellmate on the night of the attack, that Castenada did

28  not participate in the attack, and that when the fight broke out, both he and Castenada

United States District Court

For the Northern District of California

1    climbed onto their beds.  (Id.)  The declaration is not sufficient to show Pascali testified

2    falsely.  See e.g., United States v. Sherlock, 962 F.2d 1349, 1364 (9th Cir. 1992) (finding

3    inconsistencies between testimony of witnesses does not establish false evidence).  Further,

4    at the time of the trial the declaration was not available to the prosecution, as it was prepared

5    subsequent thereto; consequently, petitioner cannot make the requisite showing that the

6    prosecutor knew or should have known of the asserted falsity of Pascali's testimony.[2]

7        Accordingly, petitioner is not entitled to habeas relief on this claim.

8            c.    False Evidence/Pascali's Cooperation with Jail Authorities

9        Petitioner claims Pascali and Officer Lee falsely testified Pascali neither asked for nor

10   was promised any benefit in exchange for talking to jail authorities about the assault.  (Pet. at

11   6I-6J.)  Petitioner argues the testimony is undermined by Officer Lee's reference to Pascali in

12   his police report as an "informant."  (Id.)  Petitioner points to General Order #21.00 of the

13   Santa Clara County Sheriff's Office, defining a "confidential informant" as a person "willing

14   to provide information to law enforcement based on considerations other than good

15   citizenship."  (Pet. Ex. B.)

16       The record, however, does not show Officer Lee ever used the word "informant" in

17   his report.  Rather, a review of the record shows Officer Lee merely omitted Pascali's name

18   from the police report.  Although Officer Lee at trial testified Pascali was "what is commonly

19   known as a confidential informant" and that he did not include Pascali's name in the report at

20   Pascali's request to remain anonymous and for Pascali's own protection (RT at 372-73, 421),

21   petitioner fails to show Officer Lee used the term "confidential informant" as narrowly

22   defined in the General Order.  Further, both Pascali and Officer Lee testified that no benefits

23   were asked for or offered when Pascali spoke to the authorities following the attack.  (See RT

24   at 286, 303-05, 321-22, 327-29, 372-73, 421, 430-32, 435.)  Pascali testified he spoke to

25   Officer Lee and identified the assailants because he liked Langenegger, "felt bad" about what

26

27      [2] Petitioner also claims Pascali had a history of giving false testimony "at the behest of
     Santa Clara County agents."  (Pet. at 6I.)  Petitioner submits no evidence in support of such
28   claim.  Moreover, as discussed below in connection with petitioner's "suppression of
     evidence" claim, petitioner fails to show Pascali ever acted as a jail informant in the past, and
     the evidence at trial was to the contrary.

1  happened to him, and wanted to do the "right thing." (Id. at 304, 432.) Officer Lee testified

2  he knew Pascali was in custody on a parole violation at the time of the interview and asked

3  Pascali about his parole status (id. at 303, 428-29); although Lee took note of Pascali's parole

4  status and intended to apprise Pascali's parole agent that he had assisted in an investigation,

5  he did not offer to help Pascali on the parole matter or in any way suggest to him that he

6  would do so (id. at 303-04, 428-31, 440). In sum, there is no evidence Pascali expected or

7  was offered any benefits or that the prosecution should have known about any benefits.

8       Accordingly, petitioner is not entitled to habeas relief on this claim.

9            d.   False Evidence/Pascali's Testimony at Trial

10      Petitioner claims the prosecution knowingly presented false and misleading evidence

11  that (1) Pascali did not testify at trial in exchange for favorable treatment at his parole

12  revocation hearing and (2) Pascali absconded from parole because he feared retaliation by the

13  Norteños. (Pet. at 6O-6R.)

14            i.   *Background*

15      On October 10, 2000, Pascali was arrested on a parole violation for a failed drug test

16  and placed in the county jail. (RT at 264, 298-99, 790, 804.) On October 23, 2000, he

17  received from the Board of Prison Terms a "screening" offer of six months jail time. (Id. at

18  324-25, 369, 790, 792, 805.) His parole agent, Michelle Donovan ("Donovan"), testified she

19  was surprised by the offer and considered it "very high" given the typical offer for a failed

20  drug test was anywhere from no jail time up to four months. (Id. at 792, 797.) Pascali

21  rejected the offer and asked for a parole revocation hearing. (Id. at 324-25, 369-70, 792.)

22      On October 27, 2000, Pascali was still in custody awaiting his parole revocation

23  hearing when the assault in this case took place. (Id. at 184, 194-96, 264, 298-99, 790.) As

24  noted above, Pascali spoke to Officer Lee after the attack and identified the assailants. (Id. at

25  304, 432.)

26      Pascali had his parole revocation hearing on November 8, 2000. (Id. at 286, 299, 325,

27  790, 793.) At some point before the hearing, Sergeant Tarabini, Officer Lee's superior

28  officer, informed Donovan about Pascali's cooperation in the assault case, but did not ask her

11

United States District Court

For the Northern District of California

1   to help get Pascali released.  (Id. at 603-04, 806-09.)  On the day of the hearing, Pascali

2   separately told Donovan about his cooperation with authorities.  (Id. at 795, 808.)

3       Donovan spoke on Pascali's behalf at the parole revocation hearing.  (Id. at 286-87,

4   325, 793.)  She mentioned his cooperation with jail authorities but primarily focused on

5   Pascali's good performance on parole.  (Id. at 287, 325-28, 795-96.)  Donovan recommended

6   Pascali be given credit for time served and be ordered to complete a drug treatment program.

7   (Id. at 794, 796.)  The parole board adopted the recommendation, and Pascali was released

8   from custody that day, having served approximately 30 days for the parole violation.  (Id. at

9   287, 299, 324, 794.)

10      In its written disposition, the parole board noted only Pascali's good performance on

11  parole, and made no reference to his cooperation with authorities, as the reason for giving

12  him credit for time served.  (Id. at 798-99.)  Both Pascali and Donovan testified at

13  petitioner's trial that they did not believe the information about Pascali's cooperation had any

14  bearing on the parole board's disposition.  (Id. at 327-29, 352, 795.)

15      On December 13, 2000, while still out of custody, Pascali testified against petitioner

16  and his co-defendants at their preliminary hearing.  (Id. at 257-58.)

17      A few months later, Pascali was cited for a second parole violation, specifically,

18  driving under the influence ("DUI"), and released.  (Id. at 260, 345-46, 803.)  According to

19  Pascali's testimony at petitioner's trial, Pascali was afraid of being labeled a "snitch" and

20  killed if he was returned to custody (id. at 260, 314), and called the prosecutor to ask if the

21  prosecutor "could help [him] out with [his] parole officer and [his] parole violation."  (Id. at

22  260-61, 313-14.)  Pascali further testified the prosecutor said he "would put in a good word

23  for [him] at [his] parole hearing but . . . couldn't make any promises."  (Id. at 261.)  After

24  talking to the prosecutor, Pascali absconded from parole.  (Id. at 261, 346, 802-03.)  He

25  testified he absconded out of fear of being killed if he testified against the defendants while

26  in custody.  (Id. at 261-62, 346.)

27      Two weeks before petitioner's trial, Pascali was apprehended on his DUI parole

28  violation and placed in protective custody within the jail, where he remained at the time of

United States District Court

For the Northern District of California

petitioner's trial.  (Id. at 257, 260-62, 345, 375.)  Pascali testified he did not feel entirely safe in protective custody and had not wanted to testify but the prosecutor had forced him to appear.  (Id. at 257, 263, 371-72.)  Pascali testified the prosecutor made him no promises in exchange for his testimony.  (Id. at 286.)  At the time of trial, Pascali still had not received a parole revocation hearing on the DUI parole violation.  (Id. at 803-04.)[3]

ii.     *Analysis*

Petitioner claims "[i]t was misconduct to allow the jury to believe that Pascali's treatment at his November 8, 200[0] hearing did not constitute favorable treatment."  (Pet. at 6R.)  There is no indication in the record, however, that Pascali received favorable treatment at his parole hearing based on his cooperation in this case.  As discussed above, Pascali, Office Lee, and Sergeant Tarabini all testified Pascali was not promised anything.  Further, the record shows Donovan's recommendation to the parole board and the parole board's disposition were based on Pascali's good performance on parole.

Petitioner also claims the evidence that Pascali absconded from parole out of fear of the Norteños was misleading because "Pascali's criminal record demonstrates that he had a history of absconding from and failing probation and parole supervision."  (Pet. at 6Q.)  Petitioner, however, offers no support for his contention that Pascali had a history of absconding from probation and parole, and the record is to the contrary; in particular, the trial testimony established this was Pascali's first time on parole.  (RT at 340, 342-44.)  Lastly, petitioner cannot show the claimed non-disclosure was material to his case given that the California Court of Appeal reversed the judgment on petitioner's gang enhancement.

Accordingly, petitioner is not entitled to habeas relief on this claim.

e.    Improper Closing Argument

Petitioner claims the prosecutor committed misconduct during his closing argument by using the Norteño gang evidence "to inflame the passions of the jury."  (Pet. at 6J.)

---

[3] Petitioner states the resolution of Pascali's parole violation was delayed to ensure Pascali was in court to testify in accordance with the prosecution's theory.  (Pet. at 6Q.)  Petitioner further states Pascali "received undisclosed quid pro quo" and "an ultimate sentence of only two months."  (Id.)  Petitioner provides no evidence, however, to substantiate either such assertion.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). Under <u>Darden</u>, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the trial with unfairness." <u>Tak Sun Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation and citation omitted).

Petitioner argues the prosecutor's closing argument encouraged the jurors to "stand up to the gangs" and gives the following examples of improper remarks:

> So who is going to run the jails, is it DOC [Department of Corrections] or is it going to be the gangs? (RT at 831.)

> [T]his type of case is basically a challenge to or an assault on the integrity of our criminal justice system. . . . So we have to take on the gangs. We can't just roll over and say, Well, people are in danger, people might die, therefore we can't do anything. No, we have to stand fast and we have to stand up to these gangs. (RT at 832-33.)

The Court agrees the above-quoted statements were improper. The prosecutor's "take on the gangs" remarks urged the jury to convict for reasons unrelated to petitioner's guilt or innocence. "'Prosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking.'" <u>United States v. Sanchez</u>, No. 10-50192, slip op. 19805, 19812 (9th Cir. Nov. 1, 2011) (quoting <u>United States v. Nobari</u>, 574 F.3d 1065, 1076 (9th Cir. 2009)). As the Ninth Circuit has noted, "[t]he evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." <u>Id.</u> (internal quotation and citation omitted). "Similarly, prosecutors may not 'point to a particular crisis in our society and ask the jury to make a statement' with their verdict." <u>Sanchez</u>, No. 10-50192 at 19812 (quoting <u>United States v. Leon–Reyes</u>, 177 F.3d 816, 823 (9th Cir. 1999)). "Nor can prosecutors comment on the potential social ramifications of the jury's reaching a . . . verdict." <u>Id.</u> (internal quotation and citation omitted). Further, it is well-settled that a prosecutor cannot

14

United States District Court
For the Northern District of California

1  make statements "designed to appeal to the passions, fears and vulnerabilities of the jury."

2  Id. at 19813 (internal quotation and citation omitted).

3      The Court finds, however, the prosecutor's remarks here did not "so infect[] the trial

4  with unfairness" as to make the conviction a denial of due process. See Johnson, 63 F.3d at

5  929. The comments of which petitioner complains occurred within the first few pages of the

6  prosecutor's lengthy and otherwise proper closing argument (see RT at 831-59), and were

7  followed by equally lengthy closing arguments by the defense as well as the prosecutor's

8  rebuttal argument (see id. at 859-951); see also Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir.

9  1987) (holding fact improper comment is "single, isolated incident" relevant to assessment of

10  misconduct claim). Further, the jury was instructed that the arguments of the attorneys were

11  not evidence. (RT at 956.) See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000)

12  (rejecting prosecutorial misconduct claim in part because court had instructed jury that

13  attorneys' statements are not evidence).

14      Moreover, the evidence of petitioner's guilt was strong. As noted above, both

15  Langenegger and Pascali identified petitioner as the instigator of the assault (see RT at 265,

16  273, 412, 416, 421), and petitioner himself admitted to Sergeant Tarabini he had called

17  Langenegger to the gate because Langenegger had "[d]isrespected a Norteño gang member"

18  and "had to be checked" (RT at 546). Thus, it cannot be said the prosecutor's remarks had "a

19  substantial and injurious effect on or influence in determining the jury's verdict." See

20  Brecht, 507 U.S. at 637-38; see also Drayden, 232 F.3d at 713-14 (relying in part on strong

21  evidence of guilt to reject misconduct claim).

22      Accordingly, petitioner is not entitled to habeas relief on this claim.

23          f.  Suppression of Evidence

24      Petitioner claims the prosecution suppressed evidence showing Pascali had acted as an

25  informant in the past to avoid going to state prison, and had a similar motivation for

26  testifying at petitioner's trial. (Pet. at 6M-6N.)

27      "[T]he suppression by the prosecution of evidence favorable to an accused upon

28  request violates due process where the evidence is material either to guilt or to punishment,

15

irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  The duty to disclose such evidence applies even when there has been no request by the accused.  United States v. Agurs, 427 U.S. 97, 107 (1976).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682 (1985).

"There are three components of a true Brady violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  "[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Id. at 281.

Petitioner provides no evidentiary support for his contention that Pascali acted as an informant in the past, and the evidence at trial was to the contrary.  Specifically, Pascali was asked on cross-examination if, at the time of the subject assault, he had been "helping guards in the jail by making drug buys and that type of thing."  (RT at 312.)  The prosecutor objected, stating "[t]his is the first I've heard of any such thing" and "I haven't been given discovery of this if this is true."  (RT at 312-13.)  The trial court ordered defense counsel to make an offer of proof before continuing.  (RT at 313.)

A hearing was conducted outside the presence of the jury, pursuant to California Evidence Code section 402, to determine the admissibility of the evidence.  (RT at 316-20.)  At the hearing, defense counsel argued that on the recording of Pascali's parole hearing, he thought he heard Pascali's parole agent refer to Pascali's making "buys" while in jail.  (RT at 316.)  The prosecutor denied hearing any reference to "buys" on the tape.  (RT at 316.)  The trial court allowed defense counsel to ask Pascali if he had ever bought or sold drugs on behalf of jail authorities.  (RT at 318-19.)  Pascali denied doing so.  (RT at 319.)  At the

United States District Court

For the Northern District of California

1  conclusion of the hearing, the trial court granted defense counsel's request to ask Pascali the

2  same question in front of the jury, based on counsel's representation he would be calling

3  Pascali's attorney from the parole hearing to impeach Pascali's testimony.  (RT at 317, 319,

4  325.)

5      When cross-examination resumed with the jury present, Pascali again denied working

6  undercover for jail authorities.  (RT at 328-29.)  Officer Lee also denied on cross-

7  examination that Pascali had helped jail authorities on any matters aside from the assault

8  case.  (RT at 422, 440.)  Ultimately, the defense did not present Pascali's attorney from the

9  parole hearing.  Nor did the defense ask Pascali's parole agent, Donovan, about the reference

10 to "drug buys."  (See RT at 796-810.)  In sum, petitioner has failed to show Pascali acted as a

11 jail informant in the past, and that such evidence was suppressed by the prosecution.

12     Accordingly, petitioner is not entitled to habeas relief on this claim.

13     2.    Improper Investigation

14         a.    Involuntary Statements

15     Petitioner claims both his and Langenegger's statements to jail authorities after the

16 assault were involuntary and, thus, improperly admitted at trial.  (Pet. at 6S-6V.)  Petitioner

17 also challenges the admissibility of his statement under Miranda v. Arizona, 384 U.S. 436

18 (1966).  (Pet. at 6T.)

19     Involuntary confessions in state criminal cases are inadmissible under the Fourteenth

20 Amendment.  Blackburn v. Alabama, 361 U.S. 199, 206 (1960).  The voluntariness of a

21 confession is evaluated by reviewing both the police conduct in extracting the statement and

22 the effect of that conduct on the suspect.  Miller v. Fenton, 474 U.S. 104, 116 (1985); Henry

23 v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999).  Absent police misconduct causally related

24 to the confession, there is no basis for concluding a confession was involuntary in violation

25 of the Fourteenth Amendment.  Colorado v. Connelly, 479 U.S. 157, 167 (1986); Norman v.

26 Ducharme, 871 F.2d 1483, 1487 (9th Cir. 1989).  The court must consider the effect that the

27 totality of the circumstances had upon the will of the defendant.  Schneckloth v. Bustamonte,

28 412 U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of the

United States District Court

For the Northern District of California

circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14 (1963)).

Petitioner first challenges the admissibility of his statement to Sergeant Tarabini, wherein petitioner admitted he had called Langenegger to the gate because Langenegger had "[d]isrespected a Norteño gang member" and "had to be checked." Petitioner contends this statement was involuntary because petitioner was under the influence of methamphetamine at the time, a circumstance, petitioner asserts, of which Sergeant Tarabini was aware. While Sergeant Tarabini did testify petitioner displayed symptoms of being under the influence during the interview (<u>see</u> RT at 548), there is no evidence petitioner's statement was other than voluntary. Approximately six hours had passed between petitioner's methamphetamine use and his interview with Sergeant Tarabini. (<u>See</u> RT a 409, 547.) During the interview, petitioner was able to understand Sergeant Tarabini's <u>Miranda</u> warnings. (RT at 545-46.) He also was able to answer Sergeant Tarabini's questions regarding his methamphetamine use and the attack on Langenegger. (RT at 546-47.) Given the totality of the circumstances, petitioner fails to show his drug use was sufficient to "overcome his free will." <u>See</u> <u>Medeiros v. Shimoda</u>, 889 F.2d 819, 823 (9th Cir. 1989) (rejecting claim intoxication rendered confession involuntary, where petitioner was able to obey officers' orders and cooperate in conversing with them).

Petitioner next contends his statement to Sergeant Tarabini violated the Fifth Amendment because petitioner did not expressly waive his <u>Miranda</u> rights. Specifically, petitioner complains Sergeant Tarabini never asked petitioner if petitioner wished to give up his <u>Miranda</u> rights. Petitioner raised this same argument during the trial, where a hearing was held pursuant to California Evidence Code section 402. (RT at 532.) During the hearing, Sergeant Tarabini testified that as he was reading petitioner his <u>Miranda</u> rights, petitioner kept interrupting, insisting he already understood his rights. (RT at 534.) Sergeant Tarabini continued to give petitioner a complete <u>Miranda</u> admonishment, and when he was

United States District Court
For the Northern District of California

done, he asked petitioner if he understood his rights.  (RT at 534.)  Petitioner said "yes," and began answering Sergeant Tarabini's questions about the assault.  (RT at 534-36.)  Petitioner did not invoke his <u>Miranda</u> rights during the interview.  (RT at 535.)  Based on Sergeant Tarabini's testimony, the trial court found petitioner had impliedly waived his <u>Miranda</u> rights.  (RT at 539.)

A waiver of <u>Miranda</u> rights can be either express or implied.  <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>see, e.g.</u>, <u>United States v. Younger</u>, 398 F.3d 1179, 1186 (9th Cir. 2005) (finding implied waiver where, after defendant was advised but before questioning, he made spontaneous statement and responded to further questions without reference to counsel).  Here, petitioner indicated he understood his rights even before Sergeant Tarabini had finished giving the <u>Miranda</u> warning.  After the <u>Miranda</u> warning, petitioner expressly acknowledged he understood his rights and voluntarily answered Sergeant Tarabini's questions without invoking his <u>Miranda</u> rights.  Based on the record of the section 402 hearing, the trial court's finding of implied waiver cannot be deemed clearly erroneous.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991) (holding federal habeas court looks to last reasoned decision of state court).

Petitioner also challenges the admissibility of Langenegger's statements to Officer Lee and Sergeant Tarabini.  A defendant may object to the introduction of statements extracted from a non-defendant by coercion or other inquisitional tactics.  <u>Williams v. Woodford</u>, 384 F.3d 567, 593 (9th Cir. 2004).  Habeas relief is only warranted, however, where the admission of such statements "rendered the trial so fundamentally unfair as to violate due process."  <u>Id.</u>

Petitioner alleges that "state actors . . . withheld any treatment [from Langenegger] for five days after he was diagnosed with a fractured jaw in order to coerce him to give statements."  (Pet. at 6U.)  The record does show Langenegger was taken to Valley Medical Hospital after the attack and that the hospital sent him back to county jail without treatment, where he remained for five days with a broken jaw (RT at 190, 203), after which time he was returned to Valley Medical, where he underwent two surgeries (<u>id.</u>).  There is no evidence,

19

United States District Court
For the Northern District of California

1   however, the delay in treatment was at the direction of jail authorities or that any treatment

2   was denied in order to coerce Langenegger into talking to jail authorities.  Although

3   Langenegger was in pain at the time of his interviews with Officer Lee and Sergeant

4   Tarabini, each interview lasted only one or two minutes (RT at 210-11) and neither officer

5   had difficulty understanding him (RT at 433, 540-41).  At trial, Langenegger testified he

6   remembered being interviewed by both officers and gave no indication his statements to them

7   were involuntary.  (See RT at 210-12.)  Under such circumstances, it cannot be said the state

8   court unreasonably rejected petitioner's due process claim challenging the admission of

9   Langenegger's statements.

10          Moreover, even if the trial court erred in admitting petitioner's or Langenegger's

11   statements, such error did not have a "substantial and injurious effect or influence in

12   determining the jury's verdict."  See Brecht, 507 U.S. at 637.  As discussed above, Pascali's

13   testimony alone established the defendants attacked Langenegger, and that petitioner initiated

14   the attack.  Pascali's testimony was consistent with his statement to jail authorities

15   immediately after the attack, and his credibility was not seriously impeached at trial.  Further,

16   Langenegger's spontaneous statement to Officer Lee immediately after the attack, reporting

17   petitioner had called him to the front of the cell just before the Norteños attacked him (RT at

18   412), corroborated Pascali's testimony.  Consequently, the evidence of petitioner's guilt was

19   strong, even without the alleged involuntary statements.

20          Finally, petitioner contends that without the alleged involuntary statements, "the jury

21   would not have found the gang enhancement true."  (Pet. at 6U.)  As discussed above, the

22   gang enhancement was overturned on appeal.  Consequently, petitioner cannot show he was

23   prejudiced in that regard.

24          Accordingly, petitioner is not entitled to habeas relief on this claim.

25          b.     Collection of Evidence

26          Petitioner claims "law enforcement used improper methods to investigate the case."

27   (Pet. at 6V.)  Specifically, petitioner challenges Sergeant Tarabini's practice of gathering

28   evidence from his officers and memorializing their findings, along with his own, in a single

United States District Court

For the Northern District of California

1   report.  Petitioner contends Sergeant Tarabini should have tape recorded the witness

2   statements or instructed his subordinates to write separate, individual reports.  (Pet. at 6W.)

3       The Supreme Court has stated its "unwillingness to read the 'fundamental fairness'

4   requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and

5   absolute duty to retain and to preserve all material that might be of conceivable evidentiary

6   significance in a particular prosecution." Arizona v. Youngblood, 488 U.S. 51, 58 (1989)

7   (citation omitted).  "[U]nless a criminal defendant can show bad faith on the part of the

8   police, failure to preserve potentially useful evidence does not constitute a denial of due

9   process." Youngblood, 488 U.S. at 58; see also California v. Trombetta, 467 U.S. 479,

10  488-89 (1984) ("Whatever duty the Constitution imposes on the States to preserve evidence,

11  that duty must be limited to evidence that might be expected to play a significant role in the

12  suspect's defense.").

13      Here, petitioner has not even shown the police failed to preserve evidence.  He

14  complains only of the manner in which findings were memorialized, i.e. by a single report as

15  opposed to separate reports or by tape recordings of witness statements.  There is no evidence

16  jail authorities acted in bad faith in the decision to prepare one report or in not taping the

17  interviews.  Nor is there evidence jail authorities omitted potentially exculpatory evidence

18  from the report.

19      Accordingly, petitioner is not entitled to habeas relief on this claim.

20      3.   Ineffective Assistance of Counsel

21      Petitioner claims trial counsel was ineffective in failing to: (1) present a gang expert to

22  rebut the testimony of the prosecution's gang expert; (2) investigate Langenegger's "change

23  in testimony" regarding when his jaw was broken; (3) move to exclude petitioner's and

24  Langenegger's statements to Sergeant Tarabini as coerced; (4) investigate Pascali's record

25  and background further and impeach him with the resulting information, as well as object to

26  the prosecutor's evidence and argument regarding Pascali's credibility; and (5) present an

27  expert witness to discredit Sergeant Tarabini's investigative procedures.  (Pet. at 6X-6Z.)

28      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

21

United States District Court

For the Northern District of California

1  Sixth Amendment right to counsel, which guarantees not only assistance, but "effective"

2  assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to

3  prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first

4  must establish such counsel's performance was deficient, i.e., that it fell below an "objective

5  standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the

6  petitioner must establish prejudice resulting from his counsel's deficient performance, i.e.,

7  that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

8  of the proceeding would have been different." Id. at 694. "A reasonable probability is a

9  probability sufficient to undermine confidence in the outcome." Id.

10      A federal habeas court considering an ineffective assistance claim need not address

11  the prejudice prong of the Strickland test "if the petitioner cannot even establish

12  incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

13  1998). Conversely, the court "need not determine whether counsel's performance was

14  deficient before examining the prejudice suffered by the defendant as a result of the alleged

15  deficiencies." Strickland, 466 U.S. at 697.

16      Here, petitioner cannot establish ineffective assistance of counsel based on a failure to

17  call a gang expert. Petitioner has not offered any evidence showing any such proposed gang

18  expert would have provided favorable testimony. See Grigsby v. Blodgett, 130 F.3d 365,

19  373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to

20  establish prejudice"). Further, as discussed above, petitioner's conviction on the gang

21  enhancement was overturned by the state appellate court.

22      Next, as to defense counsel's purported failure to investigate Langenegger's "change

23  in testimony" regarding when his jaw was broken, petitioner does not identify where in the

24  record Langenegger gave such assertedly inconsistent testimony. See United States v.

25  Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (requiring "sufficient factual showing" to

26  substantiate ineffective assistance of counsel claim). The Court finds defense counsel

27  reasonably relied on both Langenegger's and Officer Zuger's testimony that Langenegger's

28  jaw was broken in the attack, as no other reasonable explanation was or is apparent. (See RT

22

at 190, 392.)[4]

Petitioner's remaining three claims of ineffective assistance of counsel arise from issues the Court has discussed above and found unavailing.  First, petitioner points to his attorney's failure to object to the admission of purportedly coerced statements.  As discussed above, this Court has found such statements were properly admitted.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection.")  Petitioner next points to his attorney's failure to further investigate Pascali's background.  Petitioner, however, fails to identify what additional facts counsel would have discovered through such investigation, let alone show such information would have led to a more damaging impeachment of Pascali at trial; further, as discussed above, the Court has rejected petitioner's claims that Pascali provided false testimony and that the prosecution suppressed evidence regarding Pascali's acting as an informant in the past.  Lastly, petitioner points to his attorney's failure to call an expert as to Sergeant Tarabini's investigative procedures.  Again, however, petitioner merely speculates as to what such expert could have said; further, as discussed above, petitioner fails to show how he was prejudiced by the manner in which Sergeant Tarabini collected evidence.  Under such circumstances, petitioner is unable to meet either prong of the Strickland test, and thus has not shown the state court's decision as to these claims involved either an unreasonable application of Supreme Court law or an unreasonable determination of the facts.

Accordingly, petitioner is not entitled to relief on his ineffective assistance of counsel claim.

4.     Jury Instruction

Petitioner claims the trial court erred by giving incomplete instructions on aiding and abetting.  (Pet. at 6Z-6AF.)

The trial court instructed the jury under CALJIC Nos. 3.01 and 3.02 as follows:

A person aids and abets the commission or attempted commission of a crime when he:

---

[4] Officer Zuger was the correctional officer who drove Langenegger to the hospital following the attack.  (RT at 391.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

One. With knowledge of the unlawful purpose of the perpetrator; and

Two. With the intent or purpose of committing or encouraging or facilitating the commission of the crime; and

Three. By act or advice aids, promotes, encourages, or instigates the commission of the crime.

. . .

One who aids and abets in the commission of a crime or crimes is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by the principal which is a natural and probable consequence of the crimes originally aided and abetted.

In order to find the defendant guilty of the crimes as charged in Counts 1 or 2, you must be satisfied beyond a reasonable doubt that:

One. The crime or crimes of <u>misdemeanor assault and/or battery</u> was or were committed;

Two. That the defendant aided and abetted those crimes;

Three. That a coprincipal in that crime committed the crime of <u>felonious assault or battery</u>;

Four. The crimes of <u>felonious assault and/or battery</u> were a natural and probable consequence of the commission of the crimes of <u>misdemeanor assault and/or battery</u>.

(RT at 973-75; CT at 458-59 (emphasis added).)  In sum, the trial court instructed the jury that aiders and abettors are not only guilty of the crimes aided and abetted but also guilty of the crimes of the principal that are the natural and probable consequence of the crimes aided and abetted.  Under the court's instructions, the jury, to find petitioner guilty of a felonious assault, would have to find petitioner aided and abetted misdemeanor assault and/or battery and that the crimes of felonious assault and/or battery were a natural and probable consequence of the crimes of misdemeanor assault/and or battery.

Petitioner complains that in the context of the above instructions, the trial court failed to define "misdemeanor assault," "felony assault," or "felony battery."[5]  Petitioner claims this omission allowed the jury to convict based on proof that an unspecified felonious assault or

---

[5] Petitioner concedes the trial court instructed the jury regarding the elements of misdemeanor battery as well as the elements of assault, assault by means of force likely to produce great bodily injury, and battery with serious bodily injury.  (Pet. at 6AA n.1.)

United States District Court

For the Northern District of California

battery was committed, with no requirement of force likely to produce great bodily injury or infliction of serious bodily injury.  In other words, petitioner claims, the trial court failed to tell the jury an assault by means of force likely to produce great bodily injury was the "felonious assault" referred to in the instruction and that a battery with great bodily injury was the "felonious battery" referred to in the instruction.  According to petitioner, the aiding and abetting instruction could have been interpreted as an exception to the earlier-stated requirement that the charged offense was committed by force likely to produce great bodily injury.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id. at 72.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Id.

The state appellate court rejected petitioner's claim on direct appeal on the ground the trial court (1) elsewhere instructed the jury as to the elements of assault, assault by means of force likely to produce great bodily injury, and battery with serious bodily injury; and (2) identified each of those crimes as felonies or misdemeanors.  (See Ex. 3 at 20.)

A review of the record shows the jury was instructed as follows:

Each defendant is accused in Count 1 of having violated Section 245(a)(1) of the Penal Code, a crime.

Every person who commits an assault upon the person of another by means of force likely to produce great bodily injury is guilty of a violation of Section 245(a)(1) of the Penal Code, a crime.

. . .

Each defendant is accused in Count 2 of having committed the crime of battery with serious bodily injury, a violation of Section 243(d) of the Penal Code.

Every person who willfully and unlawfully uses any force or violence upon the person of another resulting in the infliction of serious bodily injury is guilty of the crime of battery with serious bodily injury, in violation of Penal Code section 243(d) of the Penal Code.

United States District Court

For the Northern District of California

1    (RT at 963-65); see CALJIC Nos. 902, 912.[6]

2          Immediately before defining each crime charged in Count 1 and Count 2, the court

3    had instructed the jury that "[t]he Information in this case alleges that each defendant

4    committed two felonies."  (RT at 962-63; CT at 443.)[7]  And immediately after instructing the

5    jury on the principles of aiding and abetting, the court instructed the jury:

6          The crime of assault, in violation of Penal Code Section 240, a misdemeanor, is
           a lesser crime included in the crime charged in Count 1.

7
           . . .
8
           Assault has been previously described for you following the elements of assault
9          by means of force likely to produce great bodily injury.

10         The crime of battery, in violation of Section 242 of the Penal Code, a
           misdemeanor, is a lesser crime included in the crime charged in Count 2 . . . .
11
      (RT at 975.)
12
           When the record is considered as a whole, there is no reasonable likelihood the jury
13
      misunderstood the aiding and abetting instruction.  While the aiding an abetting instruction
14
      did not itself define misdemeanor assault, felony assault, and felony battery, the definitions
15
      were adequately provided elsewhere.  The Court concludes the state appellate court was not
16
      "objectively unreasonable" in denying relief.
17
           Accordingly, petitioner is not entitled to habeas relief on this claim.
18
           5.    Sentencing Error
19
           Petitioner claims the trial court "abused its discretion" in interpreting and applying
20
      California sentencing laws and in failing to dismiss an alleged "strike" pursuant to People v.
21
      Superior Court (Romero), 13 Cal. 4th 497, 508 (1996).  (Pet. at 6AF-6AI.)  In Romero, the
22
      California Supreme Court interpreted the language of California Penal Code section 1385(a)
23
      and held a trial court may, on its own motion or motion of the parties, strike prior felony
24
      conviction allegations in a case brought under the Three Strikes Law.
25

26         [6] The Court does not set forth herein the entirety of the above two instructions.  As
      noted, petitioner does not dispute that the jury was apprised thereby of the elements of each
27    such offense.

28         [7] Petitioner was also charged with an unrelated misdemeanor for his use of
      methamphetamine.  (See CT at 455.)

                                                26

United States District Court

For the Northern District of California

1    Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a

2  California state inmate "only on the ground that he is in custody in violation of the

3  Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Here, petitioner

4  does not refer to any federal law or constitutional provision in his petition with respect to his

5  sentencing claim. Rather, he alleges error under state law only. Federal habeas relief is

6  unavailable for violations of state law or for alleged error in the interpretation or application

7  of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

8    Further, the law is well-established that federal courts must defer to a state court's

9  interpretation of state sentencing laws. See Bueno v. Hallahan, 988 F.2d 86, 88 (9th Cir.

10  1993). "Absent a showing of fundamental unfairness, a state court's misapplication of its

11  own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F.3d 461,

12  469 (9th Cir. 1994). Petitioner fails to show "fundamental unfairness." Indeed, the

13  California Court of Appeal on direct review found "a review of the record, including the

14  probation reports, shows no arbitrary or irrational decision by the trial court." (Ex. 3 at 26.)

15  In support of its decision, the appellate court noted petitioner's extensive criminal history,

16  including his prior strikes for vehicular manslaughter; his repeated incarcerations from the

17  time he was 21 years old; his previous poor performance on parole; the fact his assault on

18  Langenegger occurred while petitioner was in custody awaiting sentencing in another case;

19  and his failure to take responsibility for the assault. (Id.)

20    Because petitioner's claim that the trial court abused its discretion with respect to

21  petitioner's sentence arises under state law, it is not cognizable on federal habeas review.

22  See Estelle, 502 U.S. at 67-68. Accordingly, petitioner is not entitled to federal habeas relief

23  on this claim.

24  C.    Appealability

25    The federal rules governing habeas cases brought by state prisoners require a district

26  court that issues an order denying a habeas petition to either grant or deny therein a

27  certificate of appealability. See Rules Governing § 2254 Cases, Rule 11(a).

28    A petitioner may not appeal a final order in a federal habeas corpus proceeding

27

1  without first obtaining a certificate of appealability (formerly known as a certificate of

2  probable cause to appeal).  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall

3  grant a certificate of appealability "only if the applicant has made a substantial showing of

4  the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate

5  which issues satisfy this standard, id. § 2253(c)(3).  "Where a district court has rejected the

6  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

7  straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the

8  district court's assessment of the constitutional claims debatable or wrong."  Slack v.

9  McDaniel, 529 U.S. 473, 484 (2000).

10       Here, petitioner has not made such a showing and, accordingly, a certificate of

11  appealability will be denied.

## IV.  CONCLUSION

13       For the reasons stated above, the petition for a writ of habeas corpus is hereby

14  DENIED, and a certificate of appealability is hereby DENIED.

15       The Clerk shall enter judgment in favor of respondent and close the file.

16       IT IS SO ORDERED.

17  DATED: December 13, 2011

18  _____
    MAXINE M. CHESNEY
    United States District Judge